**No. 23-55737**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

ROBERT PLATT, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED,

*Plaintiff-Appellee,*

v.

SODEXO, S.A.; SODEXO, INC.

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Central District of California
No. 8:22-cv-02211-DOC-ADC
Hon. David O. Carter

_____

**APPELLANTS' OPENING BRIEF**

_____

René E. Thorne
Ryan M. Tucker
Sean Paisan
**JACKSON LEWIS P.C.**
601 Poydras Street, Suite 1400
New Orleans, Louisiana 70130
Telephone: (504) 208-1755
Rene.Thorne@jacksonlewis.com
Ryan.Tucker@jacksonlewis.com
Sean.Paisan@jacksonlewis.com

*Attorneys for Appellants*
Sodexo, S.A. and Sodexo, Inc.

# DISCLOSURE STATEMENT

This Disclosure Statement is filed on behalf of Defendants-Appellants, Sodexo, Inc. and Sodexo, S.A. in compliance with the provisions of Rule 26.1 of the Federal Rules of Appellate Procedure.

Sodexo, Inc., a Delaware Corporation, is a wholly owned subsidiary of Sodexo, S.A.

Sodexo, S.A. is a societe anonyme organized under the laws of the Republic of France and listed on the Euronext Paris First Market. Bellon SA holds approximately 43% of Sodexo, S.A.'s capital and 57.9% of the exercisable voting rights. Based on currently available information, no other publicly held corporation holds 10% or more of Sodexo, S.A.'s stock.

A supplemental disclosure statement will be filed upon any change in the information provided herein.

Date: November 30, 2023      JACKSON LEWIS P.C.

s/ *René E. Thorne*
René E. Thorne
Ryan M. Tucker
Sean Paisan

*Attorneys for Appellants*
Sodexo, S.A. and Sodexo, Inc.

i

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ........................................................................ i

TABLE OF CONTENTS ............................................................................... ii

TABLE OF AUTHORITIES ......................................................................... iv

INTRODUCTION ......................................................................................... 1

REQUEST FOR ORAL ARGUMENT ......................................................... 3

JURISDICTIONAL STATEMENT ............................................................... 3

STATUTORY AND REGULATORY AUTHORITIES .................................. 3

ISSUES PRESENTED .................................................................................. 3

STATEMENT OF THE CASE ...................................................................... 4

SUMMARY OF THE ARGUMENT ............................................................. 11

STANDARD OF REVIEW ........................................................................... 13

ARGUMENT ................................................................................................. 14

    I.    THE COURT'S ROLE UNDER THE FAA IS LIMITED TO TWO INQUIRIES WHICH, WHEN RESOLVED, REQUIRE REVERSAL OF THE DISTRICT COURT'S DECISION. ............... 14

    II.    THE PLAN'S ARBITRATION PROVISION IS VALID. ................ 16

        A.    Sodexo, Inc. Had Unilateral Authority to Amend the Plan, Including to Add the Arbitration Provision. ............................. 16

        B.    Only the Plan's Consent is Necessary for Arbitration; Whether Any Individual Participant Has Consented Is Irrelevant. ......... 19

        C.    The District Court's Finding of Fact About Platt's Consent Was Clear Error. .............................................................................. 22

III. THE PLAN'S ARBITRATION PROVISION ENCOMPASSES THE DISPUTES AT ISSUE. ............................................24

    A. The Arbitration Provision Encompasses Platt's Counts I-III. ..25

    B. The Arbitration Provision Encompasses Platt's Count IV Because It Is a Recast of Counts I-III. .....................................26

IV. PLATT'S EFFECTIVE VINDICATION AND UNCONSCIONABLITY DEFENSES FAIL TO RAISE ANY CONFLICT BETWEEN THE FAA AND ERISA. ...........................30

    A. The Effective Vindication Doctrine Is Not Implicated.............31

        1. Class action waivers in arbitration agreements are valid. ........................................................................31

        2. There is no disharmony between ERISA and the FAA that would justify invalidating the Arbitration Provision's class action waiver. .........................................34

    B. Platt's reliance on the unconscionability doctrine is misplaced because it cannot apply to ERISA plans. ..................................36

CONCLUSION ....................................................................................................38

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alday v. Raytheon Co.*,
  693 F.3d 772 (9th Cir. 2012) ..........................................................9, 17

*Am. Express Co. v. Italian Colors Rest.*,
  570 U.S. 228, 133 S. Ct. 2304 (2013).................................. 13, 31, 32, 33, 35, 36

*Angel Jet Servs., L.L.C. v. Red Dot Bldg. Sys.'s Emp. Ben. Plan*,
  No. 09-2123, 2010 U.S. Dist. LEXIS 16345 (D. Ariz. Feb. 8, 2010) ...............17

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011)........................................................................35

*Avecilla v. Live Nation Entm't, Inc.*,
  No. 23-1943, 2023 U.S. Dist. LEXIS 139169
  (C.D. Cal. Aug. 7, 2023)................................................ 13, 20, 21, 22, 34, 36, 37

*Berkelhammer v. ADP Totalsource Grp., Inc.*,
  74 F.4th 115 (3d Cir. 2023) ..........................................................12, 19

*Burnett v. Prudent Fiduciary Serv., LLC*,
  No. 22-270, 2023 U.S. Dist. LEXIS 38524 (D. Del. Mar. 8, 2023)...................33

*Bushley v. Credit Suisse First Bos.*,
  360 F.3d 1149 (9th Cir. 2004) ........................................................13

*Carpenters Health & Welfare Tr. v. Vonderharr*,
  384 F.3d 667 (9th Cir. 2004) ...........................................................37

*Cedeno v. Argent Tr. Co.*,
  No. 20-9987, 2021 U.S. Dist. LEXIS 212926 (S.D.N.Y. Nov. 2,
  2021) ..........................................................................................33

*Chappel v. Lab. Corp. of Am.*,
  232 F.3d 719 (9th Cir. 2000) ...........................................................21

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
    207 F.3d 1126 (9th Cir. 2000) ...............................................................14, 15, 16

*Cleveland v. Oracle Corp.*,
    No. 06-7826, 2007 U.S. Dist. LEXIS 20910 (N.D. Cal. Mar. 23,
    2007) ...............................................................................................................38

*Conte v. Ascension Health*,
    No. 11-12074, 2011 U.S. Dist. LEXIS 111657 (E.D. Mich. 2011) ..................17

*Cooper v. Ruane Cunniff & Goldfarb Inc.*,
    990 F.3d 173 (2d Cir. 2021) ..............................................................................25

*Curtiss-Wright Corp. v. Schoonejongen*,
    514 U.S. 73 (1995).....................................................................................11, 16

*Denzler v. Questech, Inc.*,
    80 F.3d 97 (4th Cir. 1996) ..................................................................................8

*Dorman v. Charles Schwab Corp.*,
    780 F. App'x 510 (9th Cir. 2019) ........................... 11, 12, 13, 18, 19, 20, 33, 35

*Dorman v. Charles Schwab Corp.*,
    934 F.3d 1107 (9th Cir. 2019) ...............................................................11, 18, 19

*Duke v. Luxottica U.S. Holdings Corp.*,
    No. 21-06072, 2023 U.S. Dist. LEXIS 176479 (E.D.N.Y. Sep. 30,
    2023) ...............................................................................................................27

*Epic Sys. Corp. v. Lewis*,
    138 S. Ct. 1612 (2018)................................................................................13, 34

*Everson v. Blue Cross & Blue Shield*,
    898 F. Supp. 532 (N.D. Ohio 1994) ..................................................................29

*Forsyth v. Humana, Inc.*,
    114 F.3d 1467 (9th Cir. 1997) ..........................................................................29

*Gilmer v. Interstate/Johnson Lane Corp.*,
    500 U.S. 20 (1991)............................................................................................35

*Harrison v. Envision Mgmt. Holding, Inc.*,
    59 F.4th 1090 (10th Cir. 2023) ...................................................................33, 34

v

*Holley-Gallegly v. TA Operating, LLC*,
  74 F.4th 997 (9th Cir. 2023) ....................................................3, 13, 22

*Hughes Aircraft Co. v. Jacobson*,
  525 U.S. 432 (1999)...........................................................................17

*Inter-Modal Rail Employees Ass'n v. Atchison, Topeka and Santa Fe Ry. Co.*,
  520 U.S. 510 (1997)..............................................................................9

*Jackson v. Amazon.com, Inc.*,
  65 F.4th 1093 (9th Cir. 2023) ...........................................12, 28, 30

*Kilgore v. KeyBank, Nat'l Ass'n*,
  718 F.3d 1052 (9th Cir. 2013) ...................................................11, 14

*Lim v. TForce Logistics, LLC*,
  8 F.4th 992 (9th Cir. 2021) ...............................................................14

*Local 640 Trs. v. CIGNA Health & Life Ins. Co.*,
  No. 20-01260, 2021 U.S. Dist. LEXIS 144092 (D. Ariz. Aug. 2, 2021) .....................................................................................................21

*Lockheed Corp. v. Spink*,
  517 U.S. 882 (1996)....................................................................11, 16

*M.R. v. Dreyfus*,
  697 F.3d 706 (9th Cir.2012) .............................................................22

*Mathews v. Sears Pension Plan*,
  144 F.3d 461 (7th Cir. 1998) ............................................................17

*Mitsubishi Motors Corp. v. Soler-Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985)........................................................12, 24, 28, 32

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983)........................................................................14, 24

*Mull v. Motion Picture Indus. Health Plan*,
  41 F.4th 1120 (9th Cir. 2022) ...........................................................36

*Munro v. Univ. of S. Cal.*,
  896 F.3d 1088 (9th Cir. 2018) ....................... 11, 13, 14, 16, 19, 20, 31

vi

*Nat'l Supermarkets Ass'n v. Am. Express Travel Servs. Co. (In re Am Express Merchants' Litig.)*,
681 F.3d 139 (2d Cir. 2012) ...............................................................32

*Noecker v. S. Cal. Lumber Indus. Welfare Fund*,
No. 09-05922, 2011 U.S. Dist. LEXIS 164725 (C.D. Cal. Feb. 25, 2011) ...........................................................................................13, 37

*Norcia v. Samsung Telecomms. Am., LLC*,
845 F.3d 1279 (9th Cir. 2017) ...............................................................8

*O'Connor v. Uber Techs., Inc.*,
904 F.3d 1087 (9th Cir. 2018) .............................................................14

*Perez v. DirecTV Grp. Holdings, LLC*,
251 F. Supp. 3d 1328 (C.D. Cal. 2017) ...............................................28

*PM Grp. Life Ins. v. Western Growers Assur. Trust*,
953 F.2d 543 (9th Cir. 1992) ...............................................................37

*Pom Wonderful LLC v. Hubbard*,
775 F.3d 1118 (9th Cir. 2014) .............................................................22

*Rabkin v. Oregon Health Scis. Univ.*,
350 F.3d 967 (9th Cir. 2003) ...............................................................22

*Ramos v. Natures Image, Inc.*,
No. 19-7094, 2020 U.S. Dist. LEXIS 88181 (C.D. Cal. Feb. 19, 2020) ...................................................................................................21

*Robertson v. Argent Tr. Co.*,
No. 21-01711, 2022 U.S. Dist. LEXIS 133578
(D. Ariz. July 27, 2022) ..............................................13, 17, 21, 35, 37

*Smith v. Bd. of Dirs. of Triad Mfg., Inc.*,
13 F.4th 613 (7th Cir. 2021) ...............................................................33

*Wireless Warehouse, Inc. v. Boost Mobile, LLC*,
No. 09-1436, 2010 U.S. Dist. LEXIS 21835 (C.D. Cal. Mar. 10, 2010) ...........................................................................................12, 28

*Zavala v. Kruse-Western, Inc.*,
562 F. Supp. 3d 1059 (E.D. Cal. 2021) ..........................................20, 21

vii

**Statutes**

9 U.S.C. § 2 .................................................................................8, 15

9 U.S.C. § 16(a)(1)(C) ........................................................................3

28 U.S.C. § 2107(a) ............................................................................3

ERISA § 409, 29 U.S.C. § 1109 ..........................................................6

ERISA § 502(a), 29 U.S.C. § 1132(a) ............................................5, 20

ERISA § 502(a)(1), 29 U.S.C. § 1132(a)(1) ..................................25, 28

ERISA § 502(a)(1)(B),
    29 U.S.C. § 1132(a)(1)(B) .................. 3, 4, 5, 7, 8, 15, 20, 24, 25, 26, 27, 29, 30

ERISA § 502(a)(2) ..............................................6, 12, 19, 20, 25, 35

ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) .................5, 6, 19, 20, 25, 27

ERISA § 702, 29 U.S.C. § 1182 ....................................................26, 27

ERISA § 702(b), 29 U.S.C. § 1182(b) ..............................................5, 6

ERISA § 702(b)(2)(B), 29 U.S.C. § 1182(b)(2)(B) ...................................2

**Other Authorities**

29 C.F.R. § 2590.702(f)(1)(v) ..............................................................2

Cal. Civ. R. 7-3 ..................................................................................6

Cir. R. 28-2.7 ....................................................................................3

Fed. R. App. P. 23 ............................................................................32

Fed. R. App. P. 32.1(b) ......................................................................3

Brian Wall, Note, *Lighten Up: Should Massachusetts Implement a
    Smoking Surcharge for State Employees?*, 46 Suffolk U. L. Rev.
    1223, 1239-41 (2013) ....................................................................1

## INTRODUCTION

Tobacco use is the leading cause of preventable disease, disability, and death in the United States. *Office on Smoking and Health (OSH)*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/tobacco/about/osh/ (last visited Oct. 24, 2023). Along with a toll on the health of users, tobacco use carries economic costs. For instance, tobacco-related health conditions increase the burden on health insurance plans. Accordingly, many plans have long-included wellness programs encouraging nicotine cessation by assessing a fee on nicotine-using plan participants. *See generally*, Brian Wall, Note, *Lighten Up: Should Massachusetts Implement a Smoking Surcharge for State Employees?*, 46 Suffolk U. L. Rev. 1223, 1239-41 (2013) (discussing healthcare costs of smoking and the growing trend of smoking surcharges).

The Sodexo, Inc. Medical Plan (the "Plan") is one such plan—its wellness program assesses a nicotine surcharge based on its participants' self-declared nicotine use status (the "Wellness Program"). The Wellness Program directly motivates nicotine-using participants to kick the habit: they can avoid the surcharge by capitalizing on the nicotine cessation resources offered by the Plan and then changing their status to non-users. It is a win-win – the participants no longer expose themselves to risk of serious diseases and the Plan is no longer burdened by the expense of those preventable diseases.

Plaintiff Robert Platt ("Platt") argues the Wellness Program violates ERISA. First, he contends participants who change their status mid-year should be entitled not only to avoid future nicotine surcharges, but also to reimbursement for all *past* nicotine surcharges paid that year. Second, he claims the entire Wellness Program is unlawful such that all nicotine surcharges paid by participants (regardless of whether they changed their status) should be returned. To that end, Platt asserts that Sodexo nefariously collected these surcharges, calls them "ill-gotten gains," and attempts to paint a picture of a scheme formed in a dark and ironically smoky room. But this is a commonsense, congressionally sanctioned, wellness program of a *health* plan. *See* 29 U.S.C. § 1182(b)(2)(B); 29 C.F.R. § 2590.702(f)(1)(v).

In any event, Platt is free to make these claims, but he must do so in individualized arbitration, which brings the case before the Court now. Based on the Plan's arbitration provision (the "Arbitration Provision"), Sodexo filed a Motion Compel Arbitration. But Platt alleged the Arbitration Provision is invalid because participants' consent is required to amend an ERISA plan's terms and he did not consent to the Plan's adoption of the Arbitration Provision. The district court erroneously agreed with Platt and turned ERISA and the FAA on their heads by untenably requiring administrators to obtain the consent of every participant for every plan change. Appellants seek review of the district court's denial of their motion to compel Platt's claims to arbitration pursuant to the Arbitration Provision.

2

## REQUEST FOR ORAL ARGUMENT

Appellants respectfully request this Court hear oral argument in this appeal.

## JURISDICTIONAL STATEMENT

The district court denied Appellants' motion to compel arbitration on July 25, 2023. Appellants timely filed their Notice of Appeal on August 22, 2023. 3-ER-402-414; 28 U.S.C. § 2107(a). This Court has jurisdiction for this appeal pursuant to 9 U.S.C. § 16(a)(1)(C); *Holley-Gallegly v. TA Operating, LLC*, 74 F.4th 997, 1000 (9th Cir. 2023).

## STATUTORY AND REGULATORY AUTHORITIES

All relevant statutory authorities appear in the Addendum to this brief. *See* Fed. R. App. P. 32.1(b); Cir. R. 28-2.7.

## ISSUES PRESENTED

I.      Whether the Court must compel arbitration upon finding the Plan's Arbitration Provision is valid and encompasses the disputes at issue.

II.      Whether the Plan's Arbitration Provision is valid because it was appropriately adopted, and consented to, by the Plan.

III.      Whether the Plan's Arbitration Provision encompasses the disputes at issue because none of Platt's claims fall within its lone exclusion for "a claim for benefits under Section 502(a)(1)(B)."

IV.     Whether the Plan's Arbitration Provision is enforceable because no conflict exists between the FAA and ERISA, from which Platt's claims arise.

## STATEMENT OF THE CASE

Sodexo, Inc. is a wholly owned subsidiary of Sodexo, S.A., an international company organized and headquartered in France (together, "Sodexo"). *See* 3-ER-353 ¶¶ 7-8. Sodexo, Inc. sponsors and administers the Plan, an employee welfare plan. 3-ER-321 ¶ 2. Platt has performed work for a subsidiary of Sodexo, Inc. since 2005 and participated in the Plan since 2016. 3-ER-321 ¶ 3; 2-ER-94 ¶ 2.

The Plan includes a Wellness Program that encourages nicotine cessation. 2-ER-141. Platt declared he was a nicotine user upon enrolling in the Plan on November 4, 2016, and changed his nicotine status to "non-user" on December 31, 2018. 3-ER-321 ¶ 3. Platt was assessed a nicotine surcharge of $23.08 per week until he changed his status and has not been assessed such a surcharge since 2018. 3-ER-321 ¶ 3; 2-ER-141.

Sodexo, Inc. amended the Plan to adopt an Arbitration Provision effective January 1, 2021. 3-ER-322 ¶ 13; 3-ER-306 § 10.13(c). The Arbitration Provision mandates individualized arbitration of all claims except "a claim for benefits under Section 502(a)(1)(B) of ERISA." 3-ER-306 § 10.13(c). Specifically, the Arbitration Provision provides, in pertinent part:

> Any claim under ERISA or otherwise with respect to the Plan, other than a claim for benefits under Section

4

> 502(a)(1)(B) of ERISA ("Arbitration Claims") must be submitted to binding arbitration administered by the American Arbitration Association ("AAA"), in accordance with its rules. Arbitration Claims must be brought in a party's individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding. All aspects of the arbitration will be governed by ERISA, and to the extent not preempted, the laws of the State of Maryland.

3-ER-306 § 10.13(c). Sodexo notified Platt of this amendment via email and mail. 3-ER-322 ¶¶ 14-16; 2-ER-94 ¶ 4.

On December 8, 2022, Platt filed his complaint against Sodexo claiming the Plan's nicotine surcharge program violated several subsections of ERISA Section 502(a), 29 U.S.C. § 1132(a). *See* 3-ER-382-401. At that time, Platt did not raise any Section 502(a)(1)(B) claims, which are the only claims excluded from the Arbitration Provision. *See* 3-ER-394-399; 3-ER-306 § 10.13(c). Indeed, Platt's complaint included the following three counts.

Count I asserted an ERISA Section 502(a)(3) claim for alleged discrimination in violation of ERISA § 702(b) on the basis that plan participants who declared that they were nicotine users, were charged nicotine surcharges, and later changed their nicotine use status mid-year should have received retroactive repayment of all nicotine surcharges paid that year until their status was changed (rather than just avoiding future nicotine surcharges). *See* 3-ER-394-395; 3-ER-367-368.

Count II asserted an ERISA § 502(a)(3) claim for alleged discrimination in violation of ERISA § 702(b) on the basis that Sodexo did not give the relevant Plan participants a statutorily required notice of a reasonable alternative standard to avoid the nicotine surcharge. *See* 3-ER-395-396; 3-ER-368-369.

Count III asserted an ERISA § 502(a)(2) claim for alleged breach of fiduciary duty in violation of ERISA § 409, 29 U.S.C. § 1109, on the basis Sodexo was unjustly enriched by "ill-gotten profits" because participants who changed their nicotine status mid-year from "nicotine user" to "non-nicotine user" were not *retroactively* refunded past surcharges and were instead only *prospectively* relieved from paying future surcharges. *See* 3-ER-397-399; 3-ER-370-372.

Shortly thereafter, and before moving to compel him to arbitrate as required by C.D. Cal. Civ. R. 7-3, Sodexo reminded Platt that the Plan mandates individual arbitration of his claims. *See* 3-ER-379; 3-ER-325 ¶ 2. Over the following months, the Parties discussed Platt's arbitration obligation and Sodexo provided Platt with relevant documents and information. *See* 3-ER-379; 3-ER-325 ¶ 2.

Rather than proceed with arbitration, Platt amended his complaint in a plain attempt to plead around the Arbitration Provision. 3-ER-351-377, *First Amended Class Action Complaint* (the "FAC"). Specifically, the FAC added a new section entitled "PLAINTIFF'S CLAIMS ARE NOT SUBJECT TO ARBITRATION," in which Platt pleaded a litany of arguments to try to circumvent the Arbitration

Provision, including his alleged lack of consent and the Arbitration Provision's alleged unenforceability under the unconscionability and effective vindication doctrines. *See* 3-ER-364-367. Moreover, in addition to the three counts originally asserted, Platt's FAC contained a fourth count.

According to Plaintiff, Count IV is a purported "claim for benefits" under ERISA § 502(a)(1)(B). In support, Platt asserts the legal theory that "[a] participant's right to avoid paying an increased cost to maintain coverage under the terms of a plan is a 'benefit' within the meaning of [Section] 502(a)(1)(B)" and that the entire Wellness Plan is invalid because it added "an additional basis for a participant's contribution level [*i.e.*, nicotine surcharges] to the three [contribution levels] permitted by the Plan." 3-ER-372-373 ¶ 88, 93. As such, Platt seeks an order requiring "Sodexo to reimburse all persons who paid the nicotine surcharge from six years prior to the filing of [his] Complaint to the present," irrespective of whether a participant changed their nicotine use status. *See* 3-ER-372-375.

On March 29, 2023, Sodexo moved to compel Platt to individualized arbitration. *See* 3-ER-348-350. Sodexo submitted substantial evidence that: (1) the Plan properly adopted the Arbitration Provision; (2) the Plan consented to arbitration; (3) Platt is bound by the Arbitration Provision by virtue of his participation in the Plan; (4) Platt's first three counts are facially encompassed by the Arbitration Provision; and (5) his fourth count is subject to the Arbitration

Provision because it is not "a claim for benefits under Section 502(a)(1)(B) of ERISA." *See* 3-ER-326-347. As described more fully below, the district court denied the motion on the grounds that Sodexo, Inc. lacked the authority to unilaterally amend the Plan to include the Arbitration Provision, which it then found to be invalidly formed under California law because Platt had not manifested his assent to the Arbitration Provision. *See* 1-ER-2-11.

Specifically, to start, the district court analyzed whether Sodexo had the unilateral authority to amend the Plan to include the Arbitration Provision by addressing the FAA's savings clause, which provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 1-ER-6; 9 U.S.C. § 2. Reasoning that a valid contract is a prerequisite to compel arbitration, the district court determined that "[its] first inquiry [was] which state's contract law governs." 1-ER-6. It then explained that "federal courts 'apply ordinary state-law principles that govern the formation of contracts to decide whether an agreement to arbitrate exists.'" 1-ER-6-7 (quoting *Norcia v. Samsung Telecomms. Am., LLC,* 845 F.3d 1279, 1283 (9th Cir. 2017) (cleaned up). But the district court also acknowledged that federal common law, instead, "governs the interpretation of ERISA plans, with state common law providing guidance." 1-ER-7 (citing *Denzler v. Questech, Inc.,* 80 F.3d 97, 101 (4th Cir. 1996)).

8

The district court recognized that "[w]ith respect to changes to ERISA plans, 'employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate' the plans unless an employer 'contractually cedes its freedom.'" 1-ER-7 (quoting *Alday v. Raytheon Co.,* 693 F.3d 772, 782 (9th Cir. 2012)). It noted this flexibility encourages employers "to offer more generous benefits at the outset, since they are free to reduce benefits should economic conditions sour." 1-ER-8 (quoting *Inter-Modal Rail Employees Ass'n v. Atchison, Topeka and Santa Fe Ry. Co.,* 520 U.S. 510, 515 (1997)). Then, without any additional reasoning or citation to authorities or legislative intent, the district court found that under "[t]he legislative intent and historical jurisprudence," the power to unilaterally modify ERISA plans does not extend to arbitration agreements under the federal common law, so it would need to turn to "state law for guidance." 1-ER-8.

So the district court then turned to the question of which state law governed. 1-ER-8. In doing so, the district court first rejected Sodexo's argument for application of the Plan's Maryland choice of law provision because "the provision itself is a part of the agreement in dispute." 1-ER-8. As such, the district court analyzed the Arbitration Provision under California's contract formation principles instead. 1-ER-8-9. It explained that, under those California principles, mutual

consent is necessary to the formation of a contract and silence is no substitute. 1-ER-9.

Next, the district court focused on the notification of the Plan's amendment that Sodexo sent to Platt via email. 1-ER-10-11. When the district court did so, it incorrectly found that Sodexo sent Platt but one email providing a link to a 170-page summary plan description, when in fact, such email provided a link to a 25-page summary of material modifications, which contained the arbitration provision. 1-ER-10; 3-ER-322 ¶ 14. The district court also did not address the documents sent via regular mail to Platt containing the arbitration provision. 3-ER-235-260. In other words, Sodexo's notices to Platt regarding the Arbitration Provision were deemed insufficient because the district court incorrectly found that: (1) Sodexo sent only one email to notify participants of the Arbitration Provision (even though Sodexo sent several notifications via email and U.S. mail); and (2) the subject email contained a link to a "verbose document" in which the Arbitration Provision was "hidden" (even though it actually contained a link to a 25-page summary of material modifications rather than the 170-page summary plan description). *See* 2-ER-37-38 at 25:20-26:25, 2-ER-45 at 33:20-23. Based on these errors, the district court improperly concluded, "it is difficult to see how Plaintiff could have agreed to the provision, be it by silence or by continued participation in the plan." 1-ER-10. Ultimately, the district court ruled that no

valid agreement had been formed and, as a result, refused to compel arbitration. 1-ER-11.

Appellants timely filed their Notice of Appeal. 3-ER-402-414.

## SUMMARY OF THE ARGUMENT

I.     Relevant precedent narrows this Court's *de novo* review to the consideration of two gateway inquiries: (1) whether there is a valid arbitration agreement; and (2) whether the arbitration agreement covers the dispute. *Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013). And, unless a "conflict [exists] between the FAA and the substantive statutory provision," upon finding the satisfaction of the two gateway issues, the Court must compel arbitration. *Munro v. Univ. of S. Cal.*, 896 F.3d 1088, 1091 (9th Cir. 2018).

II.     The Arbitration Provision was validly adopted because Sodexo, Inc., like all other plan administrators, has unilateral authority to amend its ERISA Plan, including to add an arbitration provision. *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995); *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996). As such, only the Plan's consent to arbitration is relevant. *Dorman v. Charles Schwab Corp.*, 934 F.3d 1107, 1111 (9th Cir. 2019) ("*Dorman I*"); *Dorman v. Charles Schwab Corp.*, 780 F. App'x 510, 513 (9th Cir. 2019) ("*Dorman II*"). Platt's consent is of no moment–plan participants are bound by the plan's amendment to adopt an arbitration provision regardless of whether they consent. *Dorman II*, 780

11

F. App'x at 513 (finding that "The relevant question is whether *the Plan* agreed to arbitrate [] § 502(a)(2) claims.") (emphasis added); *Berkelhammer v. ADP Totalsource Grp., Inc.*, 74 F.4th 115, 120 (3d Cir. 2023) (finding that participant consent to arbitration is "irrelevant" where the plan contained an arbitration agreement). In short, by virtue of his participation in the Plan, Platt consented to the terms of the Plan, including its Arbitration Provision. *Dorman II*, 780 F. App'x at 512-13.

      III.    The Arbitration Provision encompasses the disputes at issue. Platt's Counts I-III are expressly covered by the Arbitration Provision. 3-ER-367-372; 3-ER-306 § 10.13(c); 3-ER-256. Platt's Count IV, a contrived recast of Counts I-III labeled solely to fall within the Arbitration Provision's single exclusion, was added to the FAC in an obvious attempt to plead around the Arbitration Provision. But "[t]he issue is 'whether the factual allegations underlying the claims are within the scope of the arbitration clause, whatever the legal labels attached to those allegations.'" *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1101 (9th Cir. 2023) (quoting *Mitsubishi Motors Corp. v. Soler-Chrysler-Plymouth, Inc.*, 473 U.S. 614, 622 n.9 (1985) (cleaned up). The label of Count IV does not fit its substance, which is encompassed by the Arbitration Provision. 3-ER-372-375; *Wireless Warehouse, Inc. v. Boost Mobile, LLC,* No. 09-1436, 2010 U.S. Dist. LEXIS 21835, at *15 (C.D. Cal. Mar. 10, 2010).

IV.     Neither of Platt's defenses establishes a conflict between the FAA and ERISA such that the Court needs to consider anything beyond the two gateway issues. *Munro*, 896 F.3d at 1091. First, Platt's effective vindication doctrine defense fails because arbitration provisions must be enforced as written and no disharmony exists between the FAA and ERISA. *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 236, 133 S. Ct. 2304, 2310 (2013); *Dorman II*, 780 F. App'x at 514; *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1619-24 (2018). Second, Platt's unconscionability doctrine defense fails because state law defenses cannot be used to defeat provisions in ERISA-governed plans, and arbitration (a fast, inexpensive, and favored forum) is not unconscionable. *Avecilla v. Live Nation Entm't, Inc.*, No. 23-1943, 2023 U.S. Dist. LEXIS 139169, at *13-14 (C.D. Cal. Aug. 7, 2023); *Robertson v. Argent Tr. Co.*, No. 21-01711, 2022 U.S. Dist. LEXIS 133578, at *10-14 (D. Ariz. July 27, 2022); *Noecker v. S. Cal. Lumber Indus. Welfare Fund*, No. 09-05922, 2011 U.S. Dist. LEXIS 164725, at *12 (C.D. Cal. Feb. 25, 2011), *aff'd*, 522 F. App'x 411 (9th Cir. 2013).

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's decision to grant or deny a motion to compel arbitration. *Holley-Gallegly v. TA Operating, LLC*, 74 F.4th 997, 1000 (9th Cir. 2023) (citing *Bushley v. Credit Suisse First Bos.*, 360 F.3d 1149, 1152 (9th Cir. 2004)). Any factual findings underlying the district court's

order are reviewed for clear error. *Id.* (citing *O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087, 1093 (9th Cir. 2018)).

## ARGUMENT

## I. THE COURT'S ROLE UNDER THE FAA IS LIMITED TO TWO INQUIRIES WHICH, WHEN RESOLVED, REQUIRE REVERSAL OF THE DISTRICT COURT'S DECISION.

The role for courts under the FAA is limited to "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)); *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 999 (9th Cir. 2021) ("a court's inquiry is limited to [these] two gateway issues"). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

In recognizing courts' limited purview, this Court has stated "[w]here there is no conflict between the FAA and the substantive statutory provision, the FAA limits courts' involvement to determining" the gateway issues. *Munro v. Univ. of S. Cal.*, 896 F.3d 1088, 1091 (9th Cir. 2018) (internal quotation omitted). In other words, this Court's involvement may go beyond the two gateway issues only if

14

there is a conflict between the FAA and the substantive statutory provisions underpinning the disputes—here, ERISA.

In short, this Court must determine: (1) whether the Plan's Arbitration Provision is valid; (2) whether the Plan's Arbitration Provision encompasses the issues; and (3) whether any conflict exists between the FAA and ERISA. Sodexo addresses each issue in the sections below. In Section II, Sodexo shows the Plan's Arbitration Provision is valid because an administrator's authority to amend a plan, including to adopt an arbitration provision, is unilateral so only the plan must consent to arbitration. In Section III, Sodexo shows that the Plan's Arbitration Provision encompasses the disputes at issue because, under its plain terms, it applies to all claims except for "a claim for benefits under Section 502(a)(1)(B) of ERISA," which Platt has not legitimately raised. And in Section IV, Sodexo shows that no conflict between the FAA and ERISA justifies moving beyond the gateway issues or prevents enforcement of the Arbitration Provision.

For these reasons, the Court must reverse and remand with directions instructing the district court to compel individualized arbitration of all claims. *Chiron Corp.*, 207 F.3d at 1130 ("If the response is affirmative on both counts, then the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms."). Indeed, as stated by this Court, "[t]here is no room for discretion, as the FAA 'mandates that district courts *shall* direct the parties to

15

proceed to arbitration on issues as to which an arbitration agreement has been signed.'" *Munro*, 896 F.3d at 1091 (quoting *Chiron*, at 1130) (quotation omitted).

## II.   THE PLAN'S ARBITRATION PROVISION IS VALID.

In this section, Sodexo resolves the first gateway question by demonstrating the Arbitration Provision is valid.  To do so, Sodexo makes three showings.  First, as discussed in Section II.A, Sodexo, Inc. had unilateral authority to amend the Plan to adopt the Arbitration Provision.  Second, as discussed in Section II.B, only the Plan's consent to arbitration is relevant and it was provided.  Third, as discussed in Section II.C, the district court's ruling hinged on this first gateway issue, which turned on a clearly erroneous factual finding.

### A.   Sodexo, Inc. Had Unilateral Authority to Amend the Plan, Including to Add the Arbitration Provision.

Plan administrators, like Sodexo, Inc., have nearly unfettered discretion to unilaterally amend—or even terminate—a plan.  *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78, 115 S. Ct. 1223, 1228 (1995) ("Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans."); *Lockheed Corp. v. Spink*, 517 U.S. 882, 890, 116 S. Ct. 1783, 1789 (1996).  The district court employed a faulty analysis to create an exception to that rule—that such unilateral authority does not extend to the addition of an arbitration provision.  1-ER-7-8.  But, despite the

16

district court's holding, there is no arbitration provision exception to an administrator's unilateral authority to amend.

The power to establish and amend an ERISA plan unilaterally is a bedrock ERISA principle. *See Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 442-44 (1999). Courts have held ERISA plans go "beyond take it or leave it" because a plan sponsor may autonomously amend the plan, and the "potential beneficiary, though not consulted or consenting, ordinarily is bound nevertheless by the amendment." *Mathews v. Sears Pension Plan,* 144 F.3d 461, 465 (7th Cir. 1998); *accord Angel Jet Servs., L.L.C. v. Red Dot Bldg. Sys.'s Emp. Ben. Plan*, No. 09-2123, 2010 U.S. Dist. LEXIS 16345, at *7 (D. Ariz. Feb. 8, 2010) (employee who did not negotiate ERISA plan was still bound by its terms); *Conte v. Ascension Health*, No. 11-12074, 2011 U.S. Dist. LEXIS 111657, at *6 (E.D. Mich. 2011) (ERISA plan is not a traditional bilateral contract between parties). Put simply, a plan sponsor may unilaterally amend the plan and participants are bound regardless of their consult or consent. *See Robertson v. Argent Tr. Co.*, No. 21-01711, 2022 U.S. Dist. LEXIS 133578, at *18-19 (D. Ariz. July 27, 2022). And as a practical matter, holding otherwise would make amendment all but impossible.

As the district court recognized, the unilateral right to amend is unrestricted unless an employer "contractually cedes its freedom." *Alday v. Raytheon Co.,* 693 F.3d 772, 782 (9th Cir. 2012); 1-ER-7. But Sodexo did just the opposite—it

17

expressly reserved that freedom. The Plan provides that its coverage is defined by the Plan documents, which may be amended at Sodexo's discretion and bind the participants accordingly. 3-ER-289 (Section 6.1: "the Medical Benefits available to a participant shall be those set forth in the SPD for the Component Plan [as] amended from time to time"); 3-ER-303 (Section 9.1: "This Plan may be amended at any time and from time to time by [] Sodexo"); 2-ER-221 ("[Participants] agree to accept the provisions of the Plan as they are today, or as they may be amended in the future").

This Court's decision in *Dorman I*, 934 F.3d 1107 (9th Cir. 2019), is illustrative of the substantial authority enjoyed by plan administrators to amend a plan—including to add an arbitration provision. There, this Court addressed the district court's concern that "allowing [p]lan fiduciaries to amend the [p]lan document to consent to arbitration would, in a sense, be allowing the fox to guard the henhouse." 934 F.3d at 1111. It rejected such concern and upheld the amendment adding the arbitration provision, *id*. at 1111-12, because, as explained in *Dorman II*, "the amendment was not an effort to insulate fiduciaries from ERISA liability" but rather an effort to provide a quicker and cheaper dispute resolution forum. *Dorman II*, 780 F. App'x at 513.

The ruling that Sodexo, Inc. could not amend the Plan to adopt the Arbitration Provision is legal error, clashes with *Dorman I,* and should be reversed.

18

**B.** **Only the Plan's Consent is Necessary for Arbitration; Whether Any Individual Participant Has Consented Is Irrelevant.**

Because the district court incorrectly ruled that unilateral plan amendments are unlawful, it moved on to the issue of whether Platt consented to arbitration. 1-ER-8. This, too, was improper. Instead, the relevant question is whether **the plan** agreed to arbitration. *Dorman I*, 934 F.3d 1107, 1111; *Dorman II*, 780 F. App'x 510, 513 (reversing and remanding district court's denial of motion to compel arbitration of the plaintiff's ERISA § 502(a)(2) and (3) claims where plaintiff argued they had not consented to the arbitration of those claims). As recently stated by the Third Circuit when it addressed the same issue, "the presence or absence of the individual claimants' consent to arbitration is **irrelevant**; what counts is the contract created by the plan." *Berkelhammer v. ADP Totalsource Grp., Inc.*, 74 F.4th 115, 120 (3d Cir. 2023) (discussing *Munro*, 896 F.3d 1088) (emphasis added).

Platt does not dispute that the Plan consented to arbitration by adopting the Arbitration Provision. Instead, he insists the Arbitration Provision should be invalidated because **he** allegedly did not consent to it. 3-ER-365-366 ¶¶ 57-59. And the district court improvidently agreed—it denied Sodexo's motion for this reason. 1-ER-10-11.

But under this Court's decisions in *Dorman I* and *Dorman II*, only the Plan's consent is relevant because Section 502(a)(2) and (3) claims belong to the plan, not

19

to the participant (who merely stands in the plan's shoes when bringing such claims). Noting that ERISA Section 502(a) claims "belong to a plan—not an individual," this Court maintained that "[t]he relevant question is whether **the Plan** agreed to arbitrate [] § 502(a)(2) claims." *Dorman II*, 780 F. App'x at 513 (citing *Munro*, 896 F.3d at 1092) (emphasis added); *Avecilla v. Live Nation Entm't, Inc.*, No. 23-1943, 2023 U.S. Dist. LEXIS 139169, at *13 (C.D. Cal. Aug. 7, 2023); *Zavala v. Kruse-Western, Inc.*, 562 F. Supp. 3d 1059, 1070 (E.D. Cal. 2021). In *Dorman II*, this Court held that the plaintiff participant was bound by an ERISA plan's arbitration provision because the "[p]lan agreed in the [p]lan document that all ERISA claims should be arbitrated." *Dorman II*, 780 F. App'x at 513.

Here, just as in *Dorman II*, the Plan consented in the Plan Document to arbitrate all claims except "claim[s] for benefits under Section 502(a)(1)(B) of ERISA," and thus ERISA § 502(a)(2) and (a)(3) claims like those lodged by Platt. 3-ER-306 § 10.13(c); 3-ER-256. Simply put, the Plan consented to arbitration of these claims and thus provided the only relevant consent.

Platt's position that the Arbitration Provision should be invalidated due to his purported lack of consent contradicts *Dorman II* and its legal underpinnings. Case in point, about two weeks after the district court issued its Order, another court in the Central District of California examined virtually identical issues in *Avecilla* and reached the opposite (and correct) conclusion. 2023 U.S. Dist.

LEXIS 139169, at *13-14 (C.D. Cal. Aug. 7, 2023). There, like here, the plaintiffs argued that they did not consent to a plan's arbitration provision. *Id.* Unlike here, the court summarily rejected that argument because, under applicable law, including *Dorman II*, only a plan's consent is relevant. *Id.* The *Avecilla* court found that the plan consented to arbitration and held that the plaintiffs agreed to be bound by the arbitration provision by participating in the plan. *Id.*

*Avecilla* represents the prevailing view of the courts of this Circuit and harmonizes with Sodexo's arguments (before this Court and before the district court). *See id.*; *Zavala*, 562 F. Supp. 3d 1059, 1070 (E.D. Cal. 2021); *Robertson v. Argent Tr. Co.,* No. 21-01711, 2022 U.S. Dist. LEXIS 133578, at *29 (D. Ariz. July 27, 2022), *Ramos v. Natures Image, Inc.,* No. 19-7094, 2020 U.S. Dist. LEXIS 88181, at *16-17 (C.D. Cal. Feb. 19, 2020), *Local 640 Trs. v. CIGNA Health & Life Ins. Co.,* No. 20-01260, 2021 U.S. Dist. LEXIS 144092, at *12 (D. Ariz. Aug. 2, 2021).

Even assuming, *arguendo*, Platt expressly withheld his consent to arbitration, he would nevertheless be bound because "[a] plan participant agrees to be bound by a provision in the plan document when he participates in the plan while the provision is in effect." *Dorman II,* at 512-13 (citing *Chappel v. Lab. Corp. of Am.*, 232 F.3d 719, 723-24 (9th Cir. 2000)); *Avecilla*, 2023 U.S. Dist. LEXIS 139169, at *12.

21

But, under the district court's ruling, ERISA plans can be enforced only where administrators have obtained the express consent of each and every participant (often numbering in the tens of thousands) to each and every term, condition, and obligation, including amendments thereto. The ruling threatens widespread negative consequences by casting doubt on every clause of an ERISA plan that has not satisfied this novel and untenable requirement. For example, under the district court's ruling, participants would need to provide consent for an ERISA plan to have a higher deductible at the start of a new plan year. Clearly, that is not the law and, if it were, it would have disastrous consequences. Put simply, the district court's ruling turns both ERISA and the FAA on their heads.

### C. The District Court's Finding of Fact About Platt's Consent Was Clear Error.

The district court's erroneous ruling on this first gateway issue was a legal conclusion that is subject to *de novo* review and entitled to no deference. *Rabkin v. Oregon Health Scis. Univ.*, 350 F.3d 967, 971 (9th Cir. 2003). Still, its legal conclusion turned on a finding of fact about Platt's consent, which is subject to the clear error standard of review. *Holley-Gallegly v. TA Operating, LLC*, 74 F.4th 997, 1000 (9th Cir. 2023). "Clear error results 'from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record.'" *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1123 (9th Cir. 2014) (quoting *M.R. v. Dreyfus,* 697 F.3d 706, 725 (9th Cir.2012)).

22

The district court incorrectly found Platt received only an email containing a link to a 170-page Summary Plan Description ("SPD"). 1-ER-10. On this faulty factual finding, the district court ruled the notice provided to Platt was insufficient to advise him that "by continuing to participate in the Plan [he] would be entering into a new or modified agreement." 1-ER-10. But that email linked to a 25-page 2021 Summary of Material Modifications ("2021 SMM"), not an SPD. 3-ER-322 ¶ 14; 3-ER-235-260. Its subject line was "Action Required: View Your Updated Summary of Material Modifications (SMM)" and the body of the email "contain[ed] an explanation of the 2021 SMM and SPDs." That SMM contained the Arbitration Provision. 3-ER-322 ¶ 14. And, in addition to that email, Sodexo sent Platt a "physical copy of the 2021 SMM via mail." 3-ER-322 ¶ 16.

The district court's factual finding was not a reasoned resolution of a disputed issue. The district court ignored the physical notice provided to Platt, erroneously identified that only one email existed, and inaccurately described that email's contents. Platt proffered no countervailing evidence and merely discussed a *different email*. 2-ER-94 ¶¶ 4-6. For these reasons, the district court's factual finding about the notification provided to Platt, and thus the failure of his consent, was clear error. The district court's ruling, based on this error, should be reversed.

23

### III. THE PLAN'S ARBITRATION PROVISION ENCOMPASSES THE DISPUTES AT ISSUE.

Although not addressed by the district court, Platt purported to raise a challenge to the second gateway question: whether the Plan's Arbitration Provision encompasses the disputes at issue. The "liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, (1983), requires that a district court send a claim to arbitration when presented with a broad Arbitration Provision like the one here as long as the underlying factual allegations "touch matters covered by" the Arbitration Provision, *Mitsubishi*, 473 U.S. at 624 n.13.

Here, the Arbitration Provision provides in pertinent part:

> Any claim under ERISA or otherwise with respect to the Plan, other than a claim for benefits under Section 502(a)(1)(B) of ERISA ("Arbitration Claims") must be submitted to binding arbitration administered by the American Arbitration Association ("AAA"), in accordance with its rules. Arbitration Claims must be brought in a party's individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding. All aspects of the arbitration will be governed by ERISA, and to the extent not preempted, the laws of the State of Maryland.

3-ER-306 § 10.13(c).

Under its express terms, the Arbitration Provision encompasses **all** claims except for "a claim for benefits under Section 502(a)(1)(B) of ERISA." 3-ER-306 § 10.13(c). In other words, the Arbitration Provision excludes from its coverage

only a claim that is both: (1) "a claim for benefits" and (2) brought "under Section 502(a)(1)(B)." 3-ER-306 § 10.13(c).

In this Section, Sodexo makes two showings to demonstrate that the Arbitration Provision encompasses all of Platt's claims. First, as shown in Section III.A, Platt's Counts I-III (which are ERISA Section 502(a)(2) and (3) claims) are facially encompassed by the Arbitration Provision. Second, as shown in Section III.B, Platt's Count IV is a recast of his first three counts; it is mislabeled as "a claim for benefits under Section 502(a)(1)(B) of ERISA" in a feeble attempt to avoid the Arbitration Provision. For these reasons, and as further explained directly below, the Court should find that the Arbitration Provision encompasses all the disputes at issue.

### A. The Arbitration Provision Encompasses Platt's Counts I-III.

The Arbitration Provision covers **all** claims except for "a claim for benefits under Section 502(a)(1)(B) of ERISA." 3-ER-306 § 10.13(c). Counts I and II are both claims under ERISA Section 502(a)(3) and Count III is an ERISA Section 502(a)(2) claim. 3-ER-367-372 ¶¶ 64-85. Additionally, Counts I-III are neither "claim[s] for benefits" nor raised "under Section 502(a)(1)(B)." 3-ER-367-372 ¶¶ 64-85; *see also Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173, 179 n.6 (2d Cir. 2021) (contrasting a Section 502(a)(2) claim with a "claim for benefits under § 502(a)(1), [which] is typically an action by an individual Plan participant

25

or beneficiary for wrongful denial of benefits"). As such, they are encompassed by the Arbitration Provision and fall outside its single exclusion.

**B.     The Arbitration Provision Encompasses Platt's Count IV Because It Is a Recast of Counts I-III.**

Despite Platt's attempt to shoehorn it into the Arbitration Provision's lone exclusion, Count IV is encompassed by the Arbitration Provision. As detailed above, after receiving Platt's complaint and prior to filing its Motion to Compel, Sodexo furnished Platt's counsel with the relevant documents and informed them of why his claims were covered by the Arbitration Provision. In response, Platt amended his complaint to try to plead around the Arbitration Provision by adding Count IV, which he labeled a "claim for benefits under Section 502(a)(1)(B) of ERISA." *See* 3-ER-372; 3-ER-306 § 10.13(c). The addition of Count IV, he argued, precludes Sodexo from establishing that the Arbitration Provision encompasses the disputes at issue. 2-ER-101-102 ("Plaintiff's Claim for Benefits Under Section 502(a)(1)(B) is Expressly Outside the Scope of the Arbitration Provision."). But, as shown below, Platt's attempt fails and Count IV is nevertheless encompassed by the Arbitration Provision.

First, beyond labeling it as such, Platt does not even allege that Count IV is a claim for benefits. Instead, he contends that "Sodexo failed to comply with the requirements of ERISA by imposing a discriminatory nicotine surcharge **in violation of 29 U.S.C. § 1182** and implementing regulations." 3-ER-373 ¶ 95

26

(emphasis added). But alleged violations of 29 U.S.C. § 1182 (ERISA § 702) are the alleged basis of Counts I and II, which Platt concedes are claims under ERISA Section 502(a)(3); 29 U.S.C. § 1132(a)(3), not claims for benefits under Section 502(a)(1)(B). *See* 3-ER-368-369 ¶¶ 69-70, 75-76.

Second, while alleging the Plan's requirement of administrative exhaustion for a claim for benefits should not apply to his claims, Platt asserts: "[t]he subject matter of [Count IV] of Plaintiff and the Class fall outside of the scope of the plan's appeals process, which reviews **questions of medical necessity, coverages, and the like, and not disputes concerning the costs borne by a participant to maintain coverage**." 3-ER-373-374 ¶ 97(b). In other words, Platt all but admits Count IV falls outside the scope of "a claim for benefits" because it is not subject to the appeals process that applies to claims for benefits.[1] *See Duke v. Luxottica U.S. Holdings Corp.*, No. 21-06072, 2023 U.S. Dist. LEXIS 176479, at *23 n.2 (E.D.N.Y. Sep. 30, 2023) (holding "[p]laintiff does not—and cannot—argue that her ERISA claims fall within the arbitration provision's carveout for claims for

---

[1] Although it is not before the Court because the Plan's Arbitration Provision encompasses all of Platt's claims, Platt is also bound by a separate arbitration agreement by virtue of his employment. To the extent Platt argues that this Count is not encompassed by the Plan's Arbitration Provision, such argument tends to push Count IV into the embrace of the employment arbitration agreement. Should it become necessary, Sodexo reserves the right to seek enforcement of that agreement.

employee benefits under any benefit plan sponsored by the [c]ompany" because "[t]his exception applies only to actions to recover benefits under a company-sponsored benefit plan under ERISA § 502(a)(1), 29 U.S.C. § 1132(a)(1)" (internal quotations and bracketing omitted)).

Irrespective of the legal labels attached to claims, the issue is whether the factual allegations underlying those claims are within the scope of the arbitration clause. *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1101 (9th Cir. 2023) (quoting *Mitsubishi*, 473 U.S. at 622 n.9). Accordingly, "[a] court must look past the labels the parties attach to their claims to the underlying factual allegations to determine whether they fall within the scope of the arbitration clause." *Wireless Warehouse, Inc. v. Boost Mobile, LLC,* No. 09-1436, 2010 U.S. Dist. LEXIS 21835, at *15 (C.D. Cal. Mar. 10, 2010) (cleaned up). This Court should look past the label he applied to Count IV and reject Platt's attempt to recast his claims to circumvent the Arbitration Provision. *See Perez v. DirecTV Grp. Holdings, LLC,* 251 F. Supp. 3d 1328, 1342-43 (C.D. Cal. 2017) (rejecting attempt to recharacterize claims for purposes of an arbitration agreement after comparing the language of the agreement to the substance of those claims).

Last, Platt asserted Count IV was not encompassed by the Arbitration Provision based on a misguided legal argument. *See* 2-ER-101-102. Specifically, he contended that claims "seeking recovery of excess fees charged … are

cognizable claims for benefits under ERISA section 502(a)(1)(B)." 2-ER-102. In support, Platt cited two cases: *Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir. 1997) and *Everson v. Blue Cross & Blue Shield*, 898 F. Supp. 532 (N.D. Ohio 1994). Neither is remotely germane.

Both cases involved secret backroom deals between the defendants and health care providers resulting in net discounts for the defendants but not the participants. In *Forsyth*, the defendant secretly negotiated a discount on the post-co-payment amount and the co-payors "paid significantly more than their 20% co-payment share." *Forsyth*, 114 F.3d at 1472. In *Everson*, the plaintiffs' claims were "based on the defendant's alleged practice of negotiating discounts with health care providers and failing to pass such discounts on to group health care plan participants" allegedly "obligat[ing participants] to make co-payments in excess of that stated in the insurance contract." *Everson*, 898 F. Supp. at 535 (N.D. Ohio 1994).

Here, Platt does not allege, and no facts support, that Sodexo clandestinely worked with a third party to obtain a material gain or to receive kickbacks or discounts on the insurance claims arising from the use of those products. Therefore, these cases provide no support for Platt's novel legal theory that claims for retroactive reimbursement of nicotine surcharges (for which he has not established entitlement in the first place) may be treated as claims for benefits

under Section 502(a)(1)(B). Therefore, Count IV does not allow Platt to avoid the Arbitration Provision and, under *Jackson v. Amazon.com, Inc.*, his mislabeling of the Count in an attempt to do so is irrelevant. 65 F.4th 1093, 1101 (9th Cir. 2023).

Moreover, Platt's pleading gamesmanship should not be rewarded as it would allow litigants to avoid arbitration with a single maneuver: adding a claim that, no matter how facially absurd, is not encompassed by an arbitration provision. In light of the above, this Court should find that all Platt's claims, including Count IV, are encompassed by the Arbitration Provision because none fall within its lone exclusion for "a claim for benefits under Section 502(a)(1)(B) of ERISA." 3-ER-306 § 10.13(c).

## IV. PLATT'S EFFECTIVE VINDICATION AND UNCONSCIONABLITY DEFENSES FAIL TO RAISE ANY CONFLICT BETWEEN THE FAA AND ERISA.

In this Section, Sodexo resolves the issues extraneous to the gateway questions by demonstrating that no conflict exist between the FAA and ERISA that could render the Plan's Arbitration Provision unenforceable. To do so, Sodexo makes two showings. First, Platt's invocation of the effective vindication doctrine is unavailing because the Arbitration Provision's class action waiver will not preclude him from vindicating any statutory ERISA right. Second, the Plan's Arbitration Provision is not unconscionable because it provides Platt with a fast, inexpensive, and favored forum to resolve his claims. For these reasons, as

30

explained directly below, the Court's inquiry needs not progress beyond the two gateway issues discussed above. *Munro v. Univ. of S. Cal.*, 896 F.3d 1088, 1091 (9th Cir. 2018).

### A. The Effective Vindication Doctrine Is Not Implicated.

Platt alleged in the FAC, and argued below, that the arbitration provision cannot be enforced under the effective vindication doctrine because it contains a class action waiver. 3-ER-366 ¶ 60; 2-ER-101-111. That argument fails for at least two reasons: (1) Supreme Court precedent holds that class action waivers within arbitration provisions must be enforced as written; and (2) no disharmony exists between the FAA and ERISA.

### 1. Class action waivers in arbitration agreements are valid.

A decade ago, the Supreme Court expressly held that arbitration provisions including class action waivers may not be invalidated simply because they include class action waivers. *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 236 (2013). There, merchants who accepted American Express cards argued that their agreement with American Express contained an arbitration clause that was unenforceable due to its inclusion of a class action waiver. *Id.* at 231. The merchants argued two bases for invalidation under the effective vindication doctrine, which parallel those pleaded by Platt. *Id.* at 233-36. The effective vindication doctrine is "a judge-made exception to the FAA," *id.* at 235, which

holds an arbitration clause will be enforced only "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum," *Mitsubishi*, 473 U.S. at 637. Reiterating that the doctrine finds its origin in the desire to prevent "prospective waiver of a party's *right to pursue* statutory remedies," *Am. Express,* at 236 (quoting *Mitsubishi*, at 637 n.19), the Court rejected both of the merchants' arguments.

First, under the FAA arbitration agreements must be rigorously enforced according to their terms "unless the FAA's mandate has been overridden by a contrary congressional command." *Id*. at 233. But the Court found no "contrary congressional command" that would have required the Court to invalidate the agreement. *Id*. It explained that the existence of a statutory right does not carry with it "an affordable procedural path to the vindication of every claim" and Rule 23 does not establish an entitlement to class proceedings for the vindication of all statutory rights. *Id*. at 233-34. Second, the Court explained "the fact that it is not worth the expense involved in *proving* a statutory remedy does not constitute the elimination of the *right to pursue* that remedy." *Id*. (citing *Nat'l Supermarkets Ass'n v. Am. Express Travel Servs. Co. (In re Am Express Merchants' Litig.)*, 681 F.3d 139, 147 (2d Cir. 2012)). Cogently, the Court remarked that a class action waiver no more eliminates a party's right to pursue a statutory remedy "than did federal law before its adoption of the class action for legal relief in 1938." *Id*.

32

Because arbitration is a matter of contract, the Arbitration Provision must be enforced according to its terms, including its class action waiver. *Id*. at 233; *Dorman II*, 780 F. App'x at 514. This conclusion is bolstered by recent decisions involving ERISA plan class action waivers in which courts have recognized that the enforceability of a class action waiver depends on its language, not on its nature as a class action waiver. *See Dorman II*, 780 F. App'x at 514 (ruling that the plan's arbitration provision, including its class action waiver, "must be enforced according to its terms, and the arbitration must be conducted on an individualized basis"); *Smith v. Bd. of Dirs. of Triad Mfg., Inc.,* 13 F.4th 613, 621-23 (7th Cir. 2021) ("The arbitration provision in [*Dorman II*], as far as we can tell, lacked the problematic language present here.").

The Arbitration Provision's class action waiver does not contain any of the language found problematic in other cases. *Compare* 3-ER-306 § 10.13(c), *with Harrison v. Envision Mgmt. Holding, Inc.*, 59 F.4th 1090, 1106 (10th Cir. 2023) (prohibiting claimants from seeking or receiving any relief that might also provide "benefits or monetary or other relief" to any other participant), *Burnett v. Prudent Fiduciary Serv., LLC*, No. 22-270, 2023 U.S. Dist. LEXIS 38524, at *3 (D. Del. Mar. 8, 2023) (dealing with "essentially the same arbitration agreement" in *Harrison* and reaching "the same conclusion" as the Tenth Circuit.), *Cedeno v. Argent Tr. Co.*, No. 20-9987, 2021 U.S. Dist. LEXIS 212926, at *4-5 (S.D.N.Y.

Nov. 2, 2021) (the arbitration agreement was virtually identical to that in *Harrison* and "limit[ed] an arbitration to providing a remedy solely with respect to a participant's individual account" and "prevent[ed] the arbitrator from awarding any relief for the benefit of the [p]lan that goes beyond a benefit for the individual participant's account"). In short, the Arbitration Provision includes no such problematic language and should be enforced as written. *See Avecilla v. Live Nation Entm't, Inc.*, No. 23-1943, 2023 U.S. Dist. LEXIS 139169, at *8-12 (C.D. Cal. Aug. 7, 2023).

> ### 2. There is no disharmony between ERISA and the FAA that would justify invalidating the Arbitration Provision's class action waiver.

For a court to find an arbitration provision unenforceable because it includes a class action waiver, the court must find that the FAA and the statute giving rise to the right to proceed collectively cannot be harmonized. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1619-24 (2018). The party attempting to show disharmony "bears the heavy burden of showing 'a clearly expressed congressional intention' that such a result should follow[,]" and Congress's intention "must be 'clear and manifest.'" *Id.* Platt cannot carry that burden.

Although presented with many opportunities, the Supreme Court has *never* declined to enforce a class action waiver because the FAA and a statute giving rise to a right to proceed collectively could not be harmonized. *Id.* at 1627 ("In many

cases over many years, this Court has heard and rejected efforts to conjure

conflicts between the [FAA] and other federal statutes [and] has rejected every

such effort to date . . .") (collecting cases); *see also Am. Express Co.*, 570 U.S. at

233 (upholding class action waiver in arbitration agreement in the antitrust

context); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011)

(invalidating state law that required availability of class-wide arbitration and

enforcing class arbitration waiver); *Gilmer v. Interstate/Johnson Lane Corp.,* 500

U.S. 20, 35 (1991) (upholding individual arbitration of age discrimination claims

brought under the ADEA). Platt's position does not present an opportunity to

break from this pattern.

Not only is ERISA silent on individual arbitration of Section 502(a)(2)

claims, but enforcement of the class action waiver would not affect the individual

recovery that Platt (or any other Plan participant) could obtain under Section

502(a)(2). Indeed, after analyzing relevant precedent, an Arizona District Court

explained that nothing "suggests that an ERISA § 502(a)(2) plaintiff has an

unqualified right to bring a collective action to recoup all of a fiduciary's losses

and gains at once." *Robertson*, 2022 U.S. Dist. LEXIS 133578, at \*29. Said

another way, "[t]here is no indication that ERISA bars plan participants from

choosing to waive collective action when an individualized remedy is still

available." *Id*. at \*29-30 (citing *Dorman II*, 780 F. App'x 510, 514 (9th Cir.

2019)).  And the Central District of California recently rejected an effective

vindication in analogous circumstances on a similar basis.  *Avecilla v. Live Nation*

*Entm't, Inc.*, No. 23-1943, 2023 U.S. Dist. LEXIS 139169, at *13-14 (C.D. Cal.

Aug. 7, 2023).

Because Platt may seek in arbitration all individual remedies he may seek in

court, this Court should find that the effective vindication doctrine is not a basis to

invalidate the Arbitration Provision and order that arbitration proceed on an

individualized basis.  *Dorman II*, at 514; *Am. Express Co.*, 570 U.S. at 233.

### B.    Platt's reliance on the unconscionability doctrine is misplaced because it cannot apply to ERISA plans.

Platt relies on the unconscionability doctrine as a substitute for any argument

that the Arbitration Provision does not encompass his claims.  In particular, in his

FAC and opposition, Platt alleged that the arbitration provision is unconscionable

under California law and thus unenforceable for several reasons.  *See* 3-ER-366 ¶¶

60, 62; 2-ER-117-119.  His reliance is misplaced because litigants cannot rely on

state law to assert a substantive unconscionability challenge to a provision in an

ERISA plan.  *See Avecilla*, 2023 U.S. Dist. LEXIS 139169, at *13-14.  Neither the

Supreme Court nor this Court has addressed whether contractual defenses such as

unconscionability, illegality, or impossibility of performance can defeat the clear

terms of an ERISA plan.  *See Mull v. Motion Picture Indus. Health Plan*, 41 F.4th

1120, 1130 (9th Cir. 2022).  But district courts in this Circuit that have considered

the issue have resolved it based on ERISA's preemption clause, which "[the Ninth Circuit has] noted repeatedly" is "'one of the broadest preemption clauses ever enacted by Congress.'" *Carpenters Health & Welfare Tr. v. Vonderharr*, 384 F.3d 667, 673 (9th Cir. 2004) (quoting *PM Grp. Life Ins. v. Western Growers Assur. Trust*, 953 F.2d 543, 545 (9th Cir. 1992)).

Indeed, courts that have considered the issue have nearly uniformly rejected unconscionability challenges to ERISA plans because of ERISA's preemption clause. For instance, in *Avecilla v. Live Nation Entm't, Inc.*, the Central District of California (virtually contemporaneously with this case) faced virtually identical arguments and summarily ruled that "Plaintiffs' argument that the Arbitration Agreement is unconscionable under California law is preempted by ERISA." No. 23-1943, 2023 U.S. Dist. LEXIS 139169, at *14 (C.D. Cal. Aug. 7, 2023). *Avecilla* is presently pending on appeal before this Court. *See* No. 23-55725.

Unlike the district court, *Avecilla* followed the Central District's earlier decision in *Noecker v. S. Cal. Lumber Indus. Welfare Fund* where similar arguments were raised and the court ruled that a "[p]laintiff's unconscionability and public policy arguments under state law are preempted by ERISA." No. 09-05922, 2011 U.S. Dist. LEXIS 164725, at *17 (C.D. Cal. Feb. 25, 2011). And this Court affirmed. 522 F. App'x 411 (9th Cir. 2013). Further, other district courts have rejected similar attempts on the same basis. *See Robertson v. Argent Tr. Co.*,

No. 21-01711, 2022 U.S. Dist. LEXIS 133578, at *13, at *5 (D. Ariz. July 27, 2022) (rejecting state law unconscionability challenge to an arbitration provision within an ERISA plan); *Cleveland v. Oracle Corp.*, No. 06-7826, 2007 U.S. Dist. LEXIS 20910, at *24 n.6 (N.D. Cal. Mar. 23, 2007) (explaining that ERISA's broad preemption language precludes the application of California law related to the "unconscionability" of an arbitration agreement within an ERISA plan).

As in the cited cases, Platt relies on state law to raise his unconscionability doctrine challenge. 3-ER-366 ¶ 60; 2-ER-117 (arguing the California Labor Code renders the Arbitration Provision unconscionable). This Court should adopt the reasoning of the district courts in this Circuit and find that Platt's unconscionability challenge fails because it is based on preempted state law.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed, and the case should be remanded with instructions directing the district court to compel individualized arbitration.

Date: November 30, 2023                JACKSON LEWIS P.C.

                                       s/ *René E. Thorne*
                                       René E. Thorne
                                       Ryan M. Tucker
                                       Sean Paisan

                                       *Attorneys for Appellants*
                                       *Sodexo, S.A. and Sodexo, Inc.*

38

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** No. 23-55737

The undersigned attorney or self-represented party states the following:

[ ] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[✓] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

   *Pamela Avecilla, et al. v. Live Nation Entertainment, Inc., et al.*, No. 23-55725. *Avecilla* involves questions of fact and law nearly identical to those presented in this case. The decisions of the district court represent a split because Judge Anderson, in *Avecilla*, reached the opposite conclusion Judge Carter did in this case. Judge Carter rendered his ruling just weeks before Judge Anderson.

   In *Avecilla*, the plaintiffs are former employees and former participants in Live Nation's 401(k) Savings Plan, which included an arbitration provision and class action waiver. 2023 U.S. Dist. LEXIS 139169, at *2, 4-5 (C.D. Cal. Aug. 7, 2023). The plaintiffs brought ERISA Section 502(a)(2), (3) claims against the defendants. *Id*. at *6. The defendants sought to compel individualized arbitration. *Id*. at *1. In opposition, the plaintiffs argued the motion should have been denied: (1) under the effective vindication doctrine; (2) because they did not consent to the arbitration provision such that no valid agreement was formed; and (3) because the arbitration provision was unconscionable and thus unenforceable. *Id*. at *7-8, 13. Judge Anderson rejected all three arguments on the grounds briefed by Sodexo.

**Signature** s/ *René E. Thorne*                **Date** November 30, 2023
*(use "s/[typed name]" to sign electronically filed documents)*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** No. 23-55737

I am the attorney or self-represented party.

**This brief contains <u>8,814</u> words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[✓] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ *René E. Thorne*    **Date** November 30, 2023
*(use "s/[typed name]" to sign electronically filed documents)*

# ADDENDUM

Pursuant to Federal Rule of Appellate Procedure 32.1(b) and Circuit Rule 28-2.7, this addendum includes the following pertinent statutory provisions, reproduced verbatim:

1. Exhibit A:   9 U.S.C. § 2
2. Exhibit B:   28 U.S.C. § 1109 (ERISA § 409)
3. Exhibit C:   28 U.S.C. § 1132 (ERISA § 502)
4. Exhibit D:   28 U.S.C. § 1182 (ERISA § 702)
5. Exhibit E:   29 C.F.R. § 2590
6. Exhibit F:   C.D. Cal. Civ. R. 7-3

EXHIBIT A

## *9 USCS § 2*

Current through Public Law 118-22, approved November 17, 2023.

*United States Code Service  >  TITLE 9. ARBITRATION (§§ 1 — 402)  >  CHAPTER 1. General provisions (§§ 1 — 16)*

## § 2. Validity, irrevocability, and enforcement of agreements to arbitrate

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4 [*9 USCS §§ 401* et seq.].

## History

**HISTORY:**

July 30, 1947, ch 392, § 1, *61 Stat. 670*; Mar. 3, 2022, *P.L. 117-90*, § 2(b)(1)(A), *136 Stat. 27*.

United States Code Service
Copyright © 2023 All rights reserved.

**End of Document**

EXHIBIT B

## 29 USCS § 1109

Current through Public Law 118-22, approved November 17, 2023.

*United States Code Service > TITLE 29. LABOR (Chs. 1 — 32) > CHAPTER 18. EMPLOYEE RETIREMENT INCOME SECURITY PROGRAM (§§ 1001 — 1461) > PROTECTION OF EMPLOYEE BENEFIT RIGHTS (§§ 1001 — 1193c) > REGULATORY PROVISIONS (§§ 1021 — 1193c) > Fiduciary Responsibility (§§ 1101 — 1114)*

## § 1109. Liability for breach of fiduciary duty

**(a)** Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 411 of this Act [*29 USCS § 1111*].

**(b)** No fiduciary shall be liable with respect to a breach of fiduciary duty under this title if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary.

## History

**HISTORY:**

Sept. 2, 1974, *P. L. 93-406*, Title I, Subtitle B, Part 4, § 409, *88 Stat. 886*.

United States Code Service
Copyright © 2023 All rights reserved.

EXHIBIT C

### *29 USCS § 1132, Part 1 of 4*

Current through Public Law 118-22, approved November 17, 2023.

*United States Code Service  >  TITLE 29. LABOR (Chs. 1 — 32)  >  CHAPTER 18. EMPLOYEE RETIREMENT INCOME SECURITY PROGRAM (§§ 1001 — 1461)  >  PROTECTION OF EMPLOYEE BENEFIT RIGHTS (§§ 1001 — 1193c)  >  REGULATORY PROVISIONS (§§ 1021 — 1193c)  > Administration and Enforcement (§§ 1131 — 1153)*

## § 1132. Civil enforcement

**(a) Persons empowered to bring a civil action.**   A civil action may be brought—

**(1)**  by a participant or beneficiary—

**(A)**  for the relief provided for in subsection (c) of this section, or

**(B)**  to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

**(2)**  by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 409 [*29 USCS § 1109*];

**(3)**  by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan;

**(4)**  by the Secretary, or by a participant, or beneficiary for appropriate relief in the case of a violation of section 105(c) or 113(a) [*29 USCS § 1025(c)* or *1032(a)*];

**(5)**  except as otherwise provided in subsection (b), by the Secretary (A) to enjoin any act or practice which violates any provision of this title, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this title;

**(6)**  by the Secretary to collect any civil penalty under paragraph (2), (4), (5), (6), (7), (8), or (9) of subsection (c) or under subsection (i) or (l);

**(7)**  by a State to enforce compliance with a qualified medical child support order (as defined in section 609(a)(2)(A) [*29 USCS § 1169(a)(2)(A)*]);

**(8)**  by the Secretary, or by an employer or other person referred to in section 101(f)(1) [*29 USCS § 1021(f)(1)*], (A) to enjoin any act or practice which violates subsection (f) of section 101 [*29 USCS § 1021(f)*], or (B) to obtain appropriate equitable relief (i) to redress such violation or (ii) to enforce such subsection;

**(9)**  in the event that the purchase of an insurance contract or insurance annuity in connection with termination of an individual's status as a participant covered under a

pension plan with respect to all or any portion of the participant's pension benefit under such plan constitutes a violation of part 4 of this title [subtitle] or the terms of the plan, by the Secretary, by any individual who was a participant or beneficiary at the time of the alleged violation, or by a fiduciary, to obtain appropriate relief, including the posting of security if necessary, to assure receipt by the participant or beneficiary of the amounts provided or to be provided by such insurance contract or annuity, plus reasonable prejudgment interest on such amounts;

**(10)** in the case of a multiemployer plan that has been certified by the actuary to be in endangered or critical status under section 305 [*29 USCS § 1085*], if the plan sponsor—

**(A)** has not adopted a funding improvement or rehabilitation plan under that section by the deadline established in such section, or

**(B)** fails to update or comply with the terms of the funding improvement or rehabilitation plan in accordance with the requirements of such section,

by an employer that has an obligation to contribute with respect to the multiemployer plan or an employee organization that represents active participants in the multiemployer plan, for an order compelling the plan sponsor to adopt a funding improvement or rehabilitation plan or to update or comply with the terms of the funding improvement or rehabilitation plan in accordance with the requirements of such section and the funding improvement or rehabilitation plan; or

**(11)** in the case of a multiemployer plan, by an employee representative, or any employer that has an obligation to contribute to the plan, (A) to enjoin any act or practice which violates subsection (k) of section 101 [*29 USCS § 1021*] (or, in the case of an employer, subsection (l) of such section), or (B) to obtain appropriate equitable relief (i) to redress such violation or (ii) to enforce such subsection.

**(b) Plans qualified under Internal Revenue Code; maintenance of actions involving delinquent contributions.**

**(1)** In the case of a plan which is qualified under *section 401(a)*, *403(a)*, or *405(a) of the Internal Revenue Code of 1986* (or with respect to which an application to so qualify has been filed and has not been finally determined) the Secretary may exercise his authority under subsection (a)(5) with respect to a violation of, or the enforcement of, parts 2 and 3 of this subtitle [*29 USCS §§ 1051* et seq., *§§ 1081* et seq.] (relating to participation, vesting, and funding), only if—

**(A)** requested by the Secretary of the Treasury, or

**(B)** one or more participants, beneficiaries, or fiduciaries, of such plan request in writing (in such manner as the Secretary shall prescribe by regulation) that he exercise such authority on their behalf. In the case of such a request under this paragraph he may exercise such authority only if he determines that such violation affects, or such enforcement is necessary to protect, claims of participants or beneficiaries to benefits under the plan.

**(2)** The Secretary shall not initiate an action to enforce section 515 [*29 USCS § 1145*].

**(3)** Except as provided in subsections (c)(9) and (a)(6) (with respect to collecting civil penalties under subsection (c)(9)), the Secretary is not authorized to enforce under this part any requirement of part 7 [*29 USCS §§ 1181* et seq.] against a health insurance issuer offering health insurance coverage in connection with a group health plan (as defined in section 733(a)(1) [*29 USCS § 1191b(a)(1)*]). Nothing in this paragraph shall affect the authority of the Secretary to issue regulations to carry out such part.

**(c) Administrator's refusal to supply requested information; penalty for failure to provide annual report in complete form.**

**(1)** Any administrator (A) who fails to meet the requirements of paragraph (1) or (4) of section 606, section 101(e)(1), section 101(f), section 105(a), or section 113(a) [*29 USCS § 1166*, *1021(e)(1)*, *1021(f)*, *1025(a)* or *1032(a)*] with respect to a participant or beneficiary, or (B) who fails or refuses to comply with a request for any information which such administrator is required by this title to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper. For purposes of this paragraph, each violation described in subparagraph (A) with respect to any single participant, and each violation described in subparagraph (B) with respect to any single participant or beneficiary, shall be treated as a separate violation.

**(2)** The Secretary may assess a civil penalty against any plan administrator of up to $1,000 a day from the date of such plan administrator's failure or refusal to file the annual report required to be filed with the Secretary under section 101(b)(1) [*29 USCS § 1021(b)(1)*]. For purposes of this paragraph, an annual report that has been rejected under section 104(a)(4) [*29 USCS § 1024(a)(4)*] for failure to provide material information shall not be treated as having been filed with the Secretary.

**(3)** Any employer maintaining a plan who fails to meet the notice requirement of section 101(d) [*29 USCS § 1021(d)*] with respect to any participant or beneficiary or who fails to meet the requirements of section 101(e)(2) [*29 USCS § 1021(e)(2)*] with respect to any person or who fails to meet the requirements of section 302(d)(12)(E) with respect to any person may in the court's discretion be liable to such participant or beneficiary or to such person in the amount of up to $100 a day from the date of such failure, and the court may in its discretion order such other relief as it deems proper.

**(4)** The Secretary may assess a civil penalty of not more than $1,000 a day for each violation by any person of subsection (j), (k), or (l) of section 101 [*29 USCS § 1021*] or section 514(e)(3) [*29 USCS § 1144(e)(3)*].

**(5)** The Secretary may assess a civil penalty against any person of up to $1,000 a day from the date of the person's failure or refusal to file the information required to be filed by such person with the Secretary under regulations prescribed pursuant to section 101(g) [*29 USCS § 1021(g)*].

**(6)** If, within 30 days of a request by the Secretary to a plan administrator for documents under section 104(a)(6) [*29 USCS § 1024(a)(6)*], the plan administrator fails to furnish the material requested to the Secretary, the Secretary may assess a civil penalty against the plan administrator of up to $100 a day from the date of such failure (but in no event in excess of $1,000 per request). No penalty shall be imposed under this paragraph for any failure resulting from matters reasonably beyond the control of the plan administrator.

**(7)** The Secretary may assess a civil penalty against a plan administrator of up to $100 a day from the date of the plan administrator's failure or refusal to provide notice to participants and beneficiaries in accordance with subsection (i) or (m) of section 101 [*29 USCS § 1021*]. For purposes of this paragraph, each violation with respect to any single participant or beneficiary shall be treated as a separate violation.

**(8)** The Secretary may assess against any plan sponsor of a multiemployer plan a civil penalty of not more than $1,100 per day—

    **(A)** for each violation by such sponsor of the requirement under section 305 [*29 USCS § 1085*] to adopt by the deadline established in that section a funding improvement plan or rehabilitation plan with respect to a multiemployer plan which is in endangered or critical status, or

    **(B)** in the case of a plan in endangered status which is not in seriously endangered status, for failure by the plan to meet the applicable benchmarks under section 305 [*29 USCS § 1085*] by the end of the funding improvement period with respect to the plan.

**(9)**

    **(A)** The Secretary may assess a civil penalty against any employer of up to $100 a day from the date of the employer's failure to meet the notice requirement of section 701(f)(3)(B)(i)(I) [*29 USCS § 1181(f)(3)(B)(i)(I)*]. For purposes of this subparagraph, each violation with respect to any single employee shall be treated as a separate violation.

    **(B)** The Secretary may assess a civil penalty against any plan administrator of up to $100 a day from the date of the plan administrator's failure to timely provide to any State the information required to be disclosed under section 701(f)(3)(B)(ii) [*29 USCS § 1181(f)(3)(B)(ii)*]. For purposes of this subparagraph, each violation with respect to any single participant or beneficiary shall be treated as a separate violation.

**(10)** Secretarial enforcement authority relating to use of genetic information.

    **(A)** General rule. The Secretary may impose a penalty against any plan sponsor of a group health plan, or any health insurance issuer offering health insurance coverage in connection with the plan, for any failure by such sponsor or issuer to meet the requirements of subsection (a)(1)(F), (b)(3), (c), or (d) of section 702 [*29 USCS § 1182*] or section 701 or 702(b)(1) [*29 USCS § 1181* or *1182(b)(1)*] with respect to genetic information, in connection with the plan.

    **(B)** Amount.

**(i)** In general. The amount of the penalty imposed by subparagraph (A) shall be $100 for each day in the noncompliance period with respect to each participant or beneficiary to whom such failure relates.

**(ii)** Noncompliance period. For purposes of this paragraph, the term "noncompliance period" means, with respect to any failure, the period—

   **(I)** beginning on the date such failure first occurs; and

   **(II)** ending on the date the failure is corrected.

**(C)** Minimum penalties where failure discovered. Notwithstanding clauses (i) and (ii) of subparagraph (D):

   **(i)** In general. In the case of 1 or more failures with respect to a participant or beneficiary—

   **(I)** which are not corrected before the date on which the plan receives a notice from the Secretary of such violation; and

   **(II)** which occurred or continued during the period involved;

the amount of penalty imposed by subparagraph (A) by reason of such failures with respect to such participant or beneficiary shall not be less than $2,500.

   **(ii)** Higher minimum penalty where violations are more than de minimis. To the extent violations for which any person is liable under this paragraph for any year are more than de minimis, clause (i) shall be applied by substituting "$15,000" for "$2,500" with respect to such person.

**(D)** Limitations.

   **(i)** Penalty not to apply where failure not discovered exercising reasonable diligence. No penalty shall be imposed by subparagraph (A) on any failure during any period for which it is established to the satisfaction of the Secretary that the person otherwise liable for such penalty did not know, and exercising reasonable diligence would not have known, that such failure existed.

   **(ii)** Penalty not to apply to failures corrected within certain periods. No penalty shall be imposed by subparagraph (A) on any failure if—

   **(I)** such failure was due to reasonable cause and not to willful neglect; and

   **(II)** such failure is corrected during the 30-day period beginning on the first date the person otherwise liable for such penalty knew, or exercising reasonable diligence would have known, that such failure existed.

   **(iii)** Overall limitation for unintentional failures. In the case of failures which are due to reasonable cause and not to willful neglect, the penalty imposed by subparagraph (A) for failures shall not exceed the amount equal to the lesser of—

   **(I)** 10 percent of the aggregate amount paid or incurred by the plan sponsor (or predecessor plan sponsor) during the preceding taxable year for group health plans; or

**(II)** $500,000.

**(E)** Waiver by Secretary. In the case of a failure which is due to reasonable cause and not to willful neglect, the Secretary may waive part or all of the penalty imposed by subparagraph (A) to the extent that the payment of such penalty would be excessive relative to the failure involved.

**(F)** Definitions. Terms used in this paragraph which are defined in section 733 [*29 USCS § 1191b*] shall have the meanings provided such terms in such section.

**(11)** The Secretary and the Secretary of Health and Human Services shall maintain such ongoing consultation as may be necessary and appropriate to coordinate enforcement under this subsection with enforcement under section 1144(c)(8) of the Social Security Act [*42 USCS § 1320b-14(c)(8)*].

**(12)** The Secretary may assess a civil penalty against any sponsor of a CSEC plan of up to $100 a day from the date of the plan sponsor's failure to comply with the requirements of section 306(j)(3) [29 USCS § 1805a(j)(3)] to establish or update a funding restoration plan.

**(d) Status of employee benefit plan as entity.**

**(1)** An employee benefit plan may sue or be sued under this title as an entity. Service of summons, subpena, or other legal process of a court upon a trustee or an administrator of an employee benefit plan in his capacity as such shall constitute service upon the employee benefit plan. In a case where a plan has not designated in the summary plan description of the plan an individual as agent for the service of legal process, service upon the Secretary shall constitute such service. The Secretary, not later than 15 days after receipt of service under the preceding sentence, shall notify the administrator or any trustee of the plan of receipt of such service.

**(2)** Any money judgment under this title against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this title.

**(e) Jurisdiction.**

**(1)** Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this title brought by the Secretary or by a participant, beneficiary, fiduciary, or any person referred to in section 101(f)(1) [*29 USCS § 1021(f)(1)*]. State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under paragraphs (1)(B) and (7) of subsection (a) of this section.

**(2)** Where an action under this title is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.

**(f) Amount in controversy; citizenship of parties.** The district courts of the United States shall have jurisdiction, without respect to the amount in controversy or the

citizenship of the parties, to grant the relief provided for in subsection (a) of this section in any action.

**(g) Attorney's fees and costs; awards in actions involving delinquent contributions.**

**(1)** In any action under this title (other than an action described in paragraph 2) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

**(2)** In any action under this title by a fiduciary for or on behalf of a plan to enforce section 515 [*29 USCS § 1145*] in which a judgment in favor of the plan is awarded, the court shall award the plan—

**(A)** the unpaid contributions,

**(B)** interest on the unpaid contributions,

**(C)** an amount equal to the greater of—

**(i)** interest on the unpaid contributions, or

**(ii)** liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

**(D)** reasonable attorney's fees and costs of the action, to be paid by the defendant, and

**(E)** such other legal or equitable relief as the court deems appropriate.

For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under *section 6621 of the Internal Revenue Code of 1986* [*26 USCS § 6621*].

**(h) Service upon Secretary of Labor and Secretary of the Treasury.** A copy of the complaint in any action under this title by a participant, beneficiary, or fiduciary (other than an action brought by one or more participants or beneficiaries under subsection (a)(1)(B) which is solely for the purpose of recovering benefits due such participants under the terms of the plan) shall be served upon the Secretary and the Secretary of the Treasury by certified mail. Either Secretary shall have the right in his discretion to intervene in any action, except that the Secretary of the Treasury may not intervene in any action under part 4 of this subtitle [*29 USCS §§ 1101* et seq.]. If the Secretary brings an action under subsection (a) on behalf of a participant or beneficiary, he shall notify the Secretary of the Treasury.

**(i) Administrative assessment of civil penalty.** In the case of a transaction prohibited by section 406 [*29 USCS § 1106*] by a party in interest with respect to a plan to which this part applies, the Secretary may assess a civil penalty against such party in interest. The amount of such penalty may not exceed 5 percent of the amount involved in each such transaction (as defined in *section 4975(f)(4) of the Internal Revenue Code of 1986* [*26 USCS § 4975(f)(4)*]) for each year or part thereof during which the prohibited transaction continues, except that, if the transaction is not corrected (in such manner as the Secretary shall prescribe in regulations which shall be consistent with section 4975(f)(5)

of such Code [*26 USCS § 4975(f)(5)*]) within 90 days after notice from the Secretary (or such longer period as the Secretary may permit), such penalty may be in an amount not more than 100 percent of the amount involved. This subsection shall not apply to a transaction with respect to a plan described in section 4975(e)(1) of such Code [*26 USCS § 4975(e)(1)*].

**(j) Direction and control of litigation by Attorney General.** In all civil actions under this title, attorneys appointed by the Secretary may represent the Secretary (except as provided in *section 518(a) of title 28, United States Code*), but all such litigation shall be subject to the direction and control of the Attorney General.

**(k) Jurisdiction of actions against the Secretary of Labor.** Suits by an administrator, fiduciary, participant, or beneficiary of an employee benefit plan to review a final order of the Secretary, to restrain the Secretary from taking any action contrary to the provisions of this Act, or to compel him to take action required under this title, may be brought in the district court of the United States for the district where the plan has its principal office, or in the United States District Court for the District of Columbia.

**(l) Civil penalties on violations by fiduciaries.**

**(1)** In the case of—

**(A)** any breach of fiduciary responsibility under (or other violation of) part 4 [*29 USCS §§ 1101* et seq.] by a fiduciary, or

**(B)** any knowing participation in such a breach or violation by any other person,

the Secretary shall assess a civil penalty against such fiduciary or other person in an amount equal to 20 percent of the applicable recovery amount.

**(2)** For purposes of paragraph (1), the term "applicable recovery amount" means any amount which is recovered from a fiduciary or other person with respect to a breach or violation described in paragraph (1)—

**(A)** pursuant to any settlement agreement with the Secretary, or

**(B)** ordered by a court to be paid by such fiduciary or other person to a plan or its participants and beneficiaries in a judicial proceeding instituted by the Secretary under subsection (a)(2) or (a)(5).

**(3)** The Secretary may, in the Secretary's sole discretion, waive or reduce the penalty under paragraph (1) if the Secretary determines in writing that—

**(A)** the fiduciary or other person acted reasonably and in good faith, or

**(B)** it is reasonable to expect that the fiduciary or other person will not be able to restore all losses to the plan (or to provide the relief ordered pursuant to subsection (a)(9)) without severe financial hardship unless such waiver or reduction is granted.

**(4)** The penalty imposed on a fiduciary or other person under this subsection with respect to any transaction shall be reduced by the amount of any penalty or tax imposed on such fiduciary or other person with respect to such transaction under

subsection (i) of this section and *section 4975 of the Internal Revenue Code of 1986* [*26 USCS § 4975*].

**(m) Penalty for improper distribution.**   In the case of a distribution to a pension plan participant or beneficiary in violation of section 206(e) [*29 USCS § 1056(e)*] by a plan fiduciary, the Secretary shall assess a penalty against such fiduciary in an amount equal to the value of the distribution. Such penalty shall not exceed $10,000 for each such distribution.

## History

**HISTORY:**

Sept. 2, 1974, *P. L. 93-406*, Title I, Subtitle B, Part 5, § 502, *88 Stat. 891*; Sept. 26, 1980, *P. L. 96-364*, Title III, § 306(b), *94 Stat. 1295*; April 7, 1986, *P. L. 99-272*, Title X, § 10002(b), *100 Stat. 231*; Dec. 22, 1987, *P. L. 100-203*, Title IX, Subtitle D, Part II, Subpart D, §§ 9342(c), 9344, *101 Stat. 1330*-372, 1330-373, Dec. 19, 1989, *P. L. 101-239*, Title II, Subtitle B, § 2101(a), (b), Title VII, Subtitle G, Part V, Subpart C, § 7881(b)(5)(B), (j)(2), (3), Subpart D, §§ 7891(a)(1), 7894(f)(1), *103 Stat. 2123*, 2438, 2442, 2445, 2450; Nov. 5, 1990, *P. L. 101-508*, Title XII, Subtitle B, § 12021(d)(2), *104 Stat. 1388*-573; Aug. 10, 1993, *P. L. 103-66*, Title IV, Subtitle D, § 4301(c)(1)–(3), *107 Stat. 376*; Oct. 22, 1994, *P. L. 103-401*, §§ 2, 3, *108 Stat. 4172*; Dec. 8, 1994, *P. L. 103-465*, Title VII, Subtitle F, Part I, Subpart B, § 761(a)(9)(B)(ii), *108 Stat. 5033*; Aug. 21, 1996, *P. L. 104-191*, Title I, Subtitle A, Part 1, § 101(b), (e)(2), 110 Stat. 1951, 1952; Sept. 26, 1996, *P. L. 104-204*, Title VI, § 603(b)(3)(E), *110 Stat. 2938*; Aug. 5, 1997, *P. L. 105-34*, Title XV, Subtitle A, § 1503(c)(2)(B), (d)(7), *111 Stat. 1062*; July 30, 2002, *P. L. 107-204*, Title III, § 306(b)(3), *116 Stat. 783*; April 10, 2004, *P. L. 108-218*, Title I, §§ 102(d), 103(b), 104(a)(2), *118 Stat. 602*, 603, 606; Aug. 17, 2006, *P. L. 109-280*, Title I, Subtitle A, § 103(b)(2), Title II, Subtitle A, § 202(b), (c), Title V, §§ 502(a)(2), (b)(2), 507(b), 508(a)(2)(C), Title IX, § 902(f)(2), *120 Stat. 816*, 884, 940, 941, 949, 951, 1039; May 21, 2008, *P. L. 110-233*, Title I, § 101(e), *122 Stat. 886*; Dec. 23, 2008, *P. L. 110-458*, Title I, Subtitle A, §§ 101(c)(1)(H), 102(b)(1)(H), (I), *122 Stat. 5097*, 5101; Feb. 4, 2009, *P. L. 111-3*, Title III, Subtitle B, § 311(b)(1)(E), *123 Stat. 70*; April 7, 2014, *P. L. 113-97*, Title I, § 102(b)(6), *128 Stat. 1117*; Dec. 16, 2014, *P. L. 113-235*, Div O, Title I, Subtitle A, § 111(d), *128 Stat. 2793*; Dec. 29, 2022, *P.L. 117-328*, Div T, Title III, § 342(c), *136 Stat. 5378*.

United States Code Service
Copyright © 2023 All rights reserved.

EXHIBIT D

## *29 USCS § 1182*

Current through Public Law 118-22, approved November 17, 2023.

*United States Code Service > TITLE 29. LABOR (Chs. 1 — 32) > CHAPTER 18. EMPLOYEE RETIREMENT INCOME SECURITY PROGRAM (§§ 1001 — 1461) > PROTECTION OF EMPLOYEE BENEFIT RIGHTS (§§ 1001 — 1193c) > REGULATORY PROVISIONS (§§ 1021 — 1193c) > Group Health Plan Requirements (§§ 1181 — 1191d) > Requirements Relating to Portability, Access, and Renewability (§§ 1181 — 1183)*

## § 1182. Prohibiting discrimination against individual participants and beneficiaries based on health status

**(a) In eligibility to enroll.**

**(1)** In general. Subject to paragraph (2), a group health plan, and a health insurance issuer offering group health insurance coverage in connection with a group health plan, may not establish rules for eligibility (including continued eligibility) of any individual to enroll under the terms of the plan based on any of the following health status-related factors in relation to the individual or a dependent of the individual:

**(A)** Health status.

**(B)** Medical condition (including both physical and mental illnesses).

**(C)** Claims experience.

**(D)** Receipt of health care.

**(E)** Medical history.

**(F)** Genetic information.

**(G)** Evidence of insurability (including conditions arising out of acts of domestic violence).

**(H)** Disability.

**(2)** No application to benefits or exclusions. To the extent consistent with section 701 [*29 USCS § 1181*], paragraph (1) shall not be construed—

**(A)** to require a group health plan, or group health insurance coverage, to provide particular benefits other than those provided under the terms of such plan or coverage, or

**(B)** to prevent such a plan or coverage from establishing limitations or restrictions on the amount, level, extent, or nature of the benefits or coverage for similarly situated individuals enrolled in the plan or coverage.

**(3)** Construction. For purposes of paragraph (1), rules for eligibility to enroll under a plan include rules defining any applicable waiting periods for such enrollment.

**(b) In premium contributions.**

**(1)** In general. A group health plan, and a health insurance issuer offering health insurance coverage in connection with a group health plan, may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual.

**(2)** Construction. Nothing in paragraph (1) shall be construed—

**(A)** to restrict the amount that an employer may be charged for coverage under a group health plan except as provided in paragraph (3); or

**(B)** to prevent a group health plan, and a health insurance issuer offering group health insurance coverage, from establishing premium discounts or rebates or modifying otherwise applicable copayments or deductibles in return for adherence to programs of health promotion and disease prevention.

**(3)** No group-based discrimination on basis of genetic information.

**(A)** In general. For purposes of this section, a group health plan, and a health insurance issuer offering group health insurance coverage in connection with a group health plan, may not adjust premium or contribution amounts for the group covered under such plan on the basis of genetic information.

**(B)** Rule of construction. Nothing in subparagraph (A) or in paragraphs (1) and (2) of subsection (d) shall be construed to limit the ability of a health insurance issuer offering health insurance coverage in connection with a group health plan to increase the premium for an employer based on the manifestation of a disease or disorder of an individual who is enrolled in the plan. In such case, the manifestation of a disease or disorder in one individual cannot also be used as genetic information about other group members and to further increase the premium for the employer.

**(c) Genetic testing.**

**(1)** Limitation on requesting or requiring genetic testing. A group health plan, and a health insurance issuer offering health insurance coverage in connection with a group health plan, shall not request or require an individual or a family member of such individual to undergo a genetic test.

**(2)** Rule of construction. Paragraph (1) shall not be construed to limit the authority of a health care professional who is providing health care services to an individual to request that such individual undergo a genetic test.

**(3)** Rule of construction regarding payment.

**(A)** In general. Nothing in paragraph (1) shall be construed to preclude a group health plan, or a health insurance issuer offering health insurance coverage in connection with a group health plan, from obtaining and using the results of a genetic test in making a determination regarding payment (as such term is defined

for the purposes of applying the regulations promulgated by the Secretary of Health and Human Services under part C of title XI of the Social Security Act [*42 USCS §§ 1320d* et seq.] and section 264 of the Health Insurance Portability and Accountability Act of 1996 [*42 USCS § 1320d-2* note], as may be revised from time to time) consistent with subsection (a).

**(B)** Limitation. For purposes of subparagraph (A), a group health plan, or a health insurance issuer offering health insurance coverage in connection with a group health plan, may request only the minimum amount of information necessary to accomplish the intended purpose.

**(4)** Research exception. Notwithstanding paragraph (1), a group health plan, or a health insurance issuer offering health insurance coverage in connection with a group health plan, may request, but not require, that a participant or beneficiary undergo a genetic test if each of the following conditions is met:

**(A)** The request is made, in writing, pursuant to research that complies with part 46 of title 45, Code of Federal Regulations, or equivalent Federal regulations, and any applicable State or local law or regulations for the protection of human subjects in research.

**(B)** The plan or issuer clearly indicates to each participant or beneficiary, or in the case of a minor child, to the legal guardian of such beneficiary, to whom the request is made that—

**(i)** compliance with the request is voluntary; and

**(ii)** non-compliance will have no effect on enrollment status or premium or contribution amounts.

**(C)** No genetic information collected or acquired under this paragraph shall be used for underwriting purposes.

**(D)** The plan or issuer notifies the Secretary in writing that the plan or issuer is conducting activities pursuant to the exception provided for under this paragraph, including a description of the activities conducted.

**(E)** The plan or issuer complies with such other conditions as the Secretary may by regulation require for activities conducted under this paragraph.

**(d) Prohibition on collection of genetic information.**

**(1)** In general. A group health plan, and a health insurance issuer offering health insurance coverage in connection with a group health plan, shall not request, require, or purchase genetic information for underwriting purposes (as defined in section 733 [*29 USCS § 1191b*]).

**(2)** Prohibition on collection of genetic information prior to enrollment. A group health plan, and a health insurance issuer offering health insurance coverage in connection with a group health plan, shall not request, require, or purchase genetic information with respect to any individual prior to such individual's enrollment under the plan or coverage in connection with such enrollment.

**(3)**  Incidental collection. If a group health plan, or a health insurance issuer offering health insurance coverage in connection with a group health plan, obtains genetic information incidental to the requesting, requiring, or purchasing of other information concerning any individual, such request, requirement, or purchase shall not be considered a violation of paragraph (2) if such request, requirement, or purchase is not in violation of paragraph (1).

**(e) Application to all plans.**   The provisions of subsections (a)(1)(F), (b)(3), (c), and (d), and subsection (b)(1) and section 701 [*29 USCS § 1181*] with respect to genetic information, shall apply to group health plans and health insurance issuers without regard to section 732(a) [*29 USCS § 1191a(a)*].

**(f) Genetic information of a fetus or embryo.**   Any reference in this part to genetic information concerning an individual or family member of an individual shall—

**(1)**  with respect to such an individual or family member of an individual who is a pregnant woman, include genetic information of any fetus carried by such pregnant woman; and

**(2)**  with respect to an individual or family member utilizing an assisted reproductive technology, include genetic information of any embryo legally held by the individual or family member.

# History

**HISTORY:**

Sept. 2, 1974, *P. L. 93-406*, Title I, Subtitle B, Part 7, Subpart A, § 702, as added Aug. 21, 1996, *P. L. 104-191*, Title I, Subtitle A, Part 1, § 101(a), 110 Stat. 1945; Sept. 26, 1996, *P. L. 104-204*, Title VI, § 603(a)(2), *122 Stat. 2935*; May 21, 2008, *P. L. 110-233*, Title I, § 101(a)–(c), *122 Stat. 883*.

United States Code Service
Copyright © 2023 All rights reserved.

EXHIBIT E

## *29 CFR 2590.702*

This document is current through the Nov. 27, 2023 issue of the Federal Register, with the exception of the amendments appearing at 88 FR 82658, 88 FR 82230, and 88 FR 82950.

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS  >  Title 29 Labor  >  Subtitle B — Regulations Relating to Labor  >  Chapter XXV — Employee Benefits Security Administration, Department of Labor  >  Subchapter L — Group Health Plans  >  Part 2590 — Rules and Regulations for Group Health Plans  >  Subpart B — Health Coverage Portability, Nondiscrimination, and Renewability*

## § 2590.702 Prohibiting discrimination against participants and beneficiaries based on a health factor.

**(a)** Health factors. (1) The term health factor means, in relation to an individual, any of the following health status-related factors:

**(i)** Health status;

**(ii)** Medical condition (including both physical and mental illnesses), as defined in § 2590.701-2;

**(iii)** Claims experience;

**(iv)** Receipt of health care;

**(v)** Medical history;

**(vi)** Genetic information, as defined in § 2590.702-1(a)(3) of this Part.

**(vii)** Evidence of insurability; or

**(viii)** Disability.

**(2)** Evidence of insurability includes—

**(i)** Conditions arising out of acts of domestic violence; and

**(ii)** Participation in activities such as motorcycling, snowmobiling, all-terrain vehicle riding, horseback riding, skiing, and other similar activities.

**(3)** The decision whether health coverage is elected for an individual (including the time chosen to enroll, such as under special enrollment or late enrollment) is not, itself, within the scope of any health factor. (However, under § 2590.701-6, a plan or issuer must treat special enrollees the same as similarly situated individuals who are enrolled when first eligible.)

**(b)** Prohibited discrimination in rules for eligibility —(1) In general —

**(i)** A group health plan, and a health insurance issuer offering health insurance coverage in connection with a group health plan, may not establish any rule for eligibility (including continued eligibility) of any individual to enroll for benefits under the terms of the plan or group health insurance coverage that discriminates based on

any health factor that relates to that individual or a dependent of that individual. This rule is subject to the provisions of paragraph (b)(2) of this section (explaining how this rule applies to benefits), paragraph (d) of this section (containing rules for establishing groups of similarly situated individuals), paragraph (e) of this section (relating to nonconfinement, actively-at-work, and other service requirements), paragraph (f) of this section (relating to wellness programs), and paragraph (g) of this section (permitting favorable treatment of individuals with adverse health factors).

**(ii)** For purposes of this section, rules for eligibility include, but are not limited to, rules relating to—

**(A)** Enrollment;

**(B)** The effective date of coverage;

**(C)** Waiting (or affiliation) periods;

**(D)** Late and special enrollment;

**(E)** Eligibility for benefit packages (including rules for individuals to change their selection among benefit packages);

**(F)** Benefits (including rules relating to covered benefits, benefit restrictions, and cost-sharing mechanisms such as coinsurance, copayments, and deductibles), as described in paragraphs (b)(2) and (3) of this section;

**(G)** Continued eligibility; and

**(H)** Terminating coverage (including disenrollment) of any individual under the plan.

**(iii)** The rules of this paragraph (b)(1) are illustrated by the following examples:

Example 1.

**(i)** Facts. An employer sponsors a group health plan that is available to all employees who enroll within the first 30 days of their employment. However, employees who do not enroll within the first days cannot enroll later unless they pass a physical examination.

**(ii)** Conclusion. In this Example 1, the requirement to pass a physical examination in order to enroll in the plan is a rule for eligibility that discriminates based on one or more health factors and thus violates this paragraph (b)(1).

Example 2.

**(i)** Facts. Under an employer's group health plan, employees who enroll during the first 30 days of employment (and during special enrollment periods) may choose between two benefit packages: an indemnity option and an HMO option. However, employees who enroll during late enrollment are permitted to enroll only in the HMO option and only if they provide evidence of good health.

**(ii)** Conclusion. In this Example 2, the requirement to provide evidence of good health in order to be eligible for late enrollment in the HMO option is a rule for eligibility that discriminates based on one or more health factors and thus violates this paragraph (b)(1). However, if the plan did not require evidence of good health but limited late enrollees to the HMO option, the plan's rules for eligibility would not discriminate based on any health factor,

and thus would not violate this paragraph (b)(1), because the time an individual chooses to enroll is not, itself, within the scope of any health factor.

Example 3.

**(i)** Facts. Under an employer's group health plan, all employees generally may enroll within the first 30 days of employment. However, individuals who participate in certain recreational activities, including motorcycling, are excluded from coverage.

**(ii)** Conclusion. In this Example 3, excluding from the plan individuals who participate in recreational activities, such as motorcycling, is a rule for eligibility that discriminates based on one more health factors and thus violates this paragraph (b)(1).

Example 4.

**(i)** Facts. A group health plan applies for a group health policy offered by an issuer. As part of the application, the issuer receives health information about individuals to be covered under the plan. Individual A is an employee of the employer maintaining the plan. A and A 's dependents have a history of high health claims. Based on the information about A and A 's dependents, the issuer excludes A and A 's dependents from the group policy it offers to the employer.

**(ii)** Conclusion. In this Example 4, the issuer's exclusion of A and A 's dependents from coverage is a rule for eligibility that discriminates based on one or more health factors, and thus violates this paragraph (b)(1). (If the employer is a small employer under *45 CFR 144.103* (generally, an employer with 50 or fewer employees), the issuer also may violate *45 CFR 146.150*, which requires issuers to offer all the policies they sell in the small group market on a guaranteed available basis to all small employers and to accept every eligible individual in every small employer group.) If the plan provides coverage through this policy and does not provide equivalent coverage for A and A 's dependents through other means, the plan will also violate this paragraph (b)(1).

**(2)** Application to benefits —(i) General rule —

**(A)** Under this section, a group health plan or group health insurance issuer is not required to provide coverage for any particular benefit to any group of similarly situated individuals.

**(B)** However, benefits provided under a plan must be uniformly available to all similarly situated individuals (as described in paragraph (d) of this section). Likewise, any restriction on a benefit or benefits must apply uniformly to all similarly situated individuals and must not be directed at individual participants or beneficiaries based on any health factor of the participants or beneficiaries (determined based on all the relevant facts and circumstances). Thus, for example, a plan may limit or exclude benefits in relation to a specific disease or condition, limit or exclude benefits for certain types of treatments or drugs, or limit or exclude benefits based on a determination of whether the benefits are experimental or not medically necessary, but only if the benefit limitation or exclusion applies uniformly to all similarly situated individuals and is not directed at individual participants or beneficiaries based on any health factor of the participants or beneficiaries. In addition, a plan or issuer may require the

29 CFR 2590.702

satisfaction of a deductible, copayment, coinsurance, or other cost-sharing requirement in order to obtain a benefit if the limit or cost-sharing requirement applies uniformly to all similarly situated individuals and is not directed at individual participants or beneficiaries based on any health factor of the participants or beneficiaries. In the case of a cost-sharing requirement, see also paragraph (b)(2)(ii) of this section, which permits variances in the application of a cost-sharing mechanism made available under a wellness program. (Whether any plan provision or practice with respect to benefits complies with this paragraph (b)(2)(i) does not affect whether the provision or practice is permitted under ERISA, the Affordable Care Act (including the requirements related to essential health benefits), the Americans with Disabilities Act, or any other law, whether State or Federal.)

**(C)** For purposes of this paragraph (b)(2)(i), a plan amendment applicable to all individuals in one or more groups of similarly situated individuals under the plan and made effective no earlier than the first day of the first plan year after the amendment is adopted is not considered to be directed at any individual participants or beneficiaries.

**(D)** The rules of this paragraph (b)(2)(i) are illustrated by the following examples: Example 1.

**(i)** Facts. A group health plan applies a $ 10,000 annual limit on a specific covered benefit that is not an essential health benefit to each participant or beneficiary covered under the plan. The limit is not directed at individual participants or beneficiaries.

**(ii)** Conclusion. In this Example 1, the limit does not violate this paragraph (b)(2)(i) because coverage of the specific, non-essential health benefit up to $ 10,000 is available uniformly to each participant and beneficiary under the plan and because the limit is applied uniformly to all participants and beneficiaries and is not directed at individual participants or beneficiaries. Example 2.

**(i)** Facts. A group health plan has a $ 500 deductible on all benefits for participants covered under the plan. Participant B files a claim for the treatment of AIDS. At the next corporate board meeting of the plan sponsor, the claim is discussed. Shortly thereafter, the plan is modified to impose a $ 2,000 deductible on benefits for the treatment of AIDS, effective before the beginning of the next plan year.

**(ii)** Conclusion. The facts of this Example 2 strongly suggest that the plan modification is directed at B based on B 's claim. Absent outweighing evidence to the contrary, the plan violates this paragraph (b)(2)(i). Example 3.

**(i)** Facts. A group health plan applies for a group health policy offered by an issuer. Individual C is covered under the plan and has an adverse health condition. As part of the application, the issuer receives health information about the individuals to be covered, including information about C 's adverse health condition. The policy form offered by the issuer generally provides benefits for the adverse health condition that C has, but in this case the

issuer offers the plan a policy modified by a rider that excludes benefits for C for that condition. The exclusionary rider is made effective the first day of the next plan year.

**(ii)** Conclusion. In this Example 3, the issuer violates this paragraph (b)(2)(i) because benefits for C 's condition are available to other individuals in the group of similarly situated individuals that includes C but are not available to C. Thus, the benefits are not uniformly available to all similarly situated individuals. Even though the exclusionary rider is made effective the first day of the next plan year, because the rider does not apply to all similarly situated individuals, the issuer violates this paragraph (b)(2)(i).

Example 4.

**(i)** Facts. A group health plan has a $ 2,000 lifetime limit for the treatment of temporomandibular joint syndrome (TMJ). The limit is applied uniformly to all similarly situated individuals and is not directed at individual participants or beneficiaries.

**(ii)** Conclusion. In this Example 4, the limit does not violate this paragraph (b)(2)(i) because $ 2,000 of benefits for the treatment of TMJ are available uniformly to all similarly situated individuals and a plan may limit benefits covered in relation to a specific disease or condition if the limit applies uniformly to all similarly situated individuals and is not directed at individual participants or beneficiaries. (However, applying a lifetime limit on TMJ may violate § 2590.715-2711, if TMJ coverage is an essential health benefit, depending on the essential health benefits benchmark plan as defined in *45 CFR 156.20*. This example does not address whether the plan provision is permissible under any other applicable law, including PHS Act section 2711 or the Americans with Disabilities Act.)

Example 5.

**(i)** Facts. A group health plan applies a $ 2 million lifetime limit on all benefits. However, the $ 2 million lifetime limit is reduced to $ 10,000 for any participant or beneficiary covered under the plan who has a congenital heart defect.

**(ii)** Conclusion. In this Example 5, the lower lifetime limit for participants and beneficiaries with a congenital heart defect violates this paragraph (b)(2)(i) because benefits under the plan are not uniformly available to all similarly situated individuals and the plan's lifetime limit on benefits does not apply uniformly to all similarly situated individuals. Additionally, this plan provision is prohibited under § 2590.715-2711 because it imposes a lifetime limit on essential health benefits.

Example 6.

**(i)** Facts. A group health plan limits benefits for prescription drugs to those listed on a drug formulary. The limit is applied uniformly to all similarly situated individuals and is not directed at individual participants or beneficiaries.

**(ii)** Conclusion. In this Example 6, the exclusion from coverage of drugs not listed on the drug formulary does not violate this paragraph (b)(2)(i) because benefits for prescription drugs listed on the formulary are uniformly available to all similarly situated individuals and because the exclusion of drugs not listed on the formulary applies uniformly to all similarly situated individuals and is not directed at individual participants or beneficiaries.

Example 7.

29 CFR 2590.702

**(i) Facts.** Under a group health plan, doctor visits are generally subject to a $ 250 annual deductible and 20 percent coinsurance requirement. However, prenatal doctor visits are not subject to any deductible or coinsurance requirement. These rules are applied uniformly to all similarly situated individuals and are not directed at individual participants or beneficiaries.

**(ii) Conclusion.** In this Example 7, imposing different deductible and coinsurance requirements for prenatal doctor visits and other visits does not violate this paragraph (b)(2)(i) because a plan may establish different deductibles or coinsurance requirements for different services if the deductible or coinsurance requirement is applied uniformly to all similarly situated individuals and is not directed at individual participants or beneficiaries.

**(ii) Exception for wellness programs.** A group health plan or group health insurance issuer may vary benefits, including cost-sharing mechanisms (such as a deductible, copayment, or coinsurance), based on whether an individual has met the standards of a wellness program that satisfies the requirements of paragraph (f) of this section.

**(iii) Specific rule relating to source-of-injury exclusions —**

> **(A)** If a group health plan or group health insurance coverage generally provides benefits for a type of injury, the plan or issuer may not deny benefits otherwise provided for treatment of the injury if the injury results from an act of domestic violence or a medical condition (including both physical and mental health conditions). This rule applies in the case of an injury resulting from a medical condition even if the condition is not diagnosed before the injury.

> **(B)** The rules of this paragraph (b)(2)(iii) are illustrated by the following examples: Example 1.

**(i) Facts.** A group health plan generally provides medical/surgical benefits, including benefits for hospital stays, that are medically necessary. However, the plan excludes benefits for self-inflicted injuries or injuries sustained in connection with attempted suicide. Because of depression, Individual D attempts suicide. As a result, D sustains injuries and is hospitalized for treatment of the injuries. Under the exclusion, the plan denies D benefits for treatment of the injuries.

**(ii) Conclusion.** In this Example 1, the suicide attempt is the result of a medical condition (depression). Accordingly, the denial of benefits for the treatments of D 's injuries violates the requirements of this paragraph (b)(2)(iii) because the plan provision excludes benefits for treatment of an injury resulting from a medical condition.

> Example 2.

**(i) Facts.** A group health plan provides benefits for head injuries generally. The plan also has a general exclusion for any injury sustained while participating in any of a number of recreational activities, including bungee jumping. However, this exclusion does not apply to any injury that results from a medical condition (nor from domestic violence). Participant E sustains a head injury while bungee jumping. The injury did not result from a medical condition (nor from domestic violence). Accordingly, the plan denies benefits for E 's head injury.

**(ii) Conclusion.** In this Example 2, the plan provision that denies benefits based on the source of an injury does not restrict benefits based on an act of domestic violence or any

medical condition. Therefore, the provision is permissible under this paragraph (b)(2)(iii) and does not violate this section. (However, if the plan did not allow E to enroll in the plan (or applied different rules for eligibility to E) because E frequently participates in bungee jumping, the plan would violate paragraph (b)(1) of this section.)

**(c)** Prohibited discrimination in premiums or contributions —(1) In general —

**(i)** A group health plan, and a health insurance issuer offering health insurance coverage in connection with a group health plan, may not require an individual, as a condition of enrollment or continued enrollment under the plan or group health insurance coverage, to pay a premium or contribution that is greater than the premium or contribution for a similarly situated individual (described in paragraph (d) of this section) enrolled in the plan or group health insurance coverage based on any health factor that relates to the individual or a dependent of the individual.

**(ii)** Discounts, rebates, payments in kind, and any other premium differential mechanisms are taken into account in determining an individual's premium or contribution rate. (For rules relating to cost-sharing mechanisms, see paragraph (b)(2) of this section (addressing benefits).)

**(2)** Rules relating to premium rates —

**(i)** Group rating based on health factors not restricted under this section. Nothing in this section restricts the aggregate amount that an employer may be charged for coverage under a group health plan. But See § 2590.702-1(b) of this Part, which prohibits adjustments in group premium or contribution rates based on genetic information.

**(ii)** List billing based on a health factor prohibited. However, a group health insurance issuer, or a group health plan, may not quote or charge an employer (or an individual) a different premium for an individual in a group of similarly situated individuals based on a health factor. (But see paragraph (g) of this section permitting favorable treatment of individuals with adverse health factors.)

**(iii)** Examples. The rules of this paragraph (c)(2) are illustrated by the following examples:

Example 1.

**(i)** Facts. An employer sponsors a group health plan and purchases coverage from a health insurance issuer. In order to determine the premium rate for the upcoming plan year, the issuer reviews the claims experience of individuals covered under the plan. The issuer finds that Individual F had significantly higher claims experience than similarly situated individuals in the plan. The issuer quotes the plan a higher per-participant rate because of F's claims experience.

**(ii)** Conclusion. In this Example 1, the issuer does not violate the provisions of this paragraph (c)(2) because the issuer blends the rate so that the employer is not quoted a higher rate for F than for a similarly situated individual based on F's claims experience. (However, if the issuer used genetic information in computing the group rate, it would violate § 2590.702-1(b) of this Part.)

Example 2.

**(i)** Facts. Same facts as Example 1, except that the issuer quotes the employer a higher premium rate for F, because of F's claims experience, than for a similarly situated individual.

> **(ii)** Conclusion. In this Example 2, the issuer violates this paragraph (c)(2). Moreover, even if the plan purchased the policy based on the quote but did not require a higher participant contribution for F than for a similarly situated individual, the issuer would still violate this paragraph (c)(2) (but in such a case the plan would not violate this paragraph (c)(2)).

> **(3)** Exception for wellness programs. Notwithstanding paragraphs (c)(1) and (2) of this section, a plan or issuer may vary the amount of premium or contribution it requires similarly situated individuals to pay based on whether an individual has met the standards of a wellness program that satisfies the requirements of paragraph (f) of this section.

**(d)** Similarly situated individuals. The requirements of this section apply only within a group of individuals who are treated as similarly situated individuals. A plan or issuer may treat participants as a group of similarly situated individuals separate from beneficiaries. In addition, participants may be treated as two or more distinct groups of similarly situated individuals and beneficiaries may be treated as two or more distinct groups of similarly situated individuals in accordance with the rules of this paragraph (d). Moreover, if individuals have a choice of two or more benefit packages, individuals choosing one benefit package may be treated as one or more groups of similarly situated individuals distinct from individuals choosing another benefit package.

> **(1)** Participants. Subject to paragraph (d)(3) of this section, a plan or issuer may treat participants as two or more distinct groups of similarly situated individuals if the distinction between or among the groups of participants is based on a bona fide employment-based classification consistent with the employer's usual business practice. Whether an employment-based classification is bona fide is determined on the basis of all the relevant facts and circumstances. Relevant facts and circumstances include whether the employer uses the classification for purposes independent of qualification for health coverage (for example, determining eligibility for other employee benefits or determining other terms of employment). Subject to paragraph (d)(3) of this section, examples of classifications that, based on all the relevant facts and circumstances, may be bona fide include full-time versus part-time status, different geographic location, membership in a collective bargaining unit, date of hire, length of service, current employee versus former employee status, and different occupations. However, a classification based on any health factor is not a bona fide employment-based classification, unless the requirements of paragraph (g) of this section are satisfied (permitting favorable treatment of individuals with adverse health factors).

> **(2)** Beneficiaries —

> > **(i)** Subject to paragraph (d)(3) of this section, a plan or issuer may treat beneficiaries as two or more distinct groups of similarly situated individuals if the distinction between or among the groups of beneficiaries is based on any of the following factors:

29 CFR 2590.702

**(A)** A bona fide employment-based classification of the participant through whom the beneficiary is receiving coverage;

**(B)** Relationship to the participant (for example, as a spouse or as a dependent child);

**(C)** Marital status;

**(D)** With respect to children of a participant, age or student status; or

**(E)** Any other factor if the factor is not a health factor.

**(ii)** Paragraph (d)(2)(i) of this section does not prevent more favorable treatment of individuals with adverse health factors in accordance with paragraph (g) of this section.

**(3)** Discrimination directed at individuals. Notwithstanding paragraphs (d)(1) and (2) of this section, if the creation or modification of an employment or coverage classification is directed at individual participants or beneficiaries based on any health factor of the participants or beneficiaries, the classification is not permitted under this paragraph (d), unless it is permitted under paragraph (g) of this section (permitting favorable treatment of individuals with adverse health factors). Thus, if an employer modified an employment-based classification to single out, based on a health factor, individual participants and beneficiaries and deny them health coverage, the new classification would not be permitted under this section.

**(4)** Examples. The rules of this paragraph (d) are illustrated by the following examples:

Example 1.

**(i)** Facts. An employer sponsors a group health plan for full-time employees only. Under the plan (consistent with the employer's usual business practice), employees who normally work at least 30 hours per week are considered to be working full-time. Other employees are considered to be working part-time. There is no evidence to suggest that the classification is directed at individual participants or beneficiaries.

**(ii)** Conclusion. In this Example 1, treating the full-time and part-time employees as two separate groups of similarly situated individuals is permitted under this paragraph (d) because the classification is bona fide and is not directed at individual participants or beneficiaries.

Example 2.

**(i)** Facts. Under a group health plan, coverage is made available to employees, their spouses, and their children. However, coverage is made available to a child only if the child is under age 26 (or under age 29 if the child is continuously enrolled full-time in an institution of higher learning (full-time students)). There is no evidence to suggest that these classifications are directed at individual participants or beneficiaries.

**(ii)** Conclusion. In this Example 2, treating spouses and children differently by imposing an age limitation on children, but not on spouses, is permitted under this paragraph (d). Specifically, the distinction between spouses and children is permitted

29 CFR 2590.702

under paragraph (d)(2) of this section and is not prohibited under paragraph (d)(3) of this section because it is not directed at individual participants or beneficiaries. It is also permissible to treat children who are under age 26 (or full-time students under age 29) as a group of similarly situated individuals separate from those who are age 26 or older (or age 29 or older if they are not full-time students) because the classification is permitted under paragraph (d)(2) of this section and is not directed at individual participants or beneficiaries.

Example 3.

**(i)** Facts. A university sponsors a group health plan that provides one health benefit package to faculty and another health benefit package to other staff. Faculty and staff are treated differently with respect to other employee benefits such as retirement benefits and leaves of absence. There is no evidence to suggest that the distinction is directed at individual participants or beneficiaries.

**(ii)** Conclusion. In this Example 3, the classification is permitted under this paragraph (d) because there is a distinction based on a bona fide employment-based classification consistent with the employer's usual business practice and the distinction is not directed at individual participants and beneficiaries.

Example 4.

**(i)** Facts. An employer sponsors a group health plan that is available to all current employees. Former employees may also be eligible, but only if they complete a specified number of years of service, are enrolled under the plan at the time of termination of employment, and are continuously enrolled from that date. There is no evidence to suggest that these distinctions are directed at individual participants or beneficiaries.

**(ii)** Conclusion. In this Example 4, imposing additional eligibility requirements on former employees is permitted because a classification that distinguishes between current and former employees is a bona fide employment-based classification that is permitted under this paragraph (d), provided that it is not directed at individual participants or beneficiaries. In addition, it is permissible to distinguish between former employees who satisfy the service requirement and those who do not, provided that the distinction is not directed at individual participants or beneficiaries. (However, former employees who do not satisfy the eligibility criteria may, nonetheless, be eligible for continued coverage pursuant to a COBRA continuation provision or similar State law.)

Example 5.

**(i)** Facts. An employer sponsors a group health plan that provides the same benefit package to all seven employees of the employer. Six of the seven employees have the same job title and responsibilities, but Employee G has a different job title and different responsibilities. After G files an expensive claim for benefits under the plan, coverage under the plan is modified so that employees with G' s job title receive a different benefit package that includes a higher deductible than in the benefit package made available to the other six employees.

**(ii)** Conclusion. Under the facts of this Example 5, changing the coverage classification for G based on the existing employment classification for G is not

permitted under this paragraph (d) because the creation of the new coverage classification for G is directed at G based on one or more health factors.

**(e)** Nonconfinement and actively-at-work provisions —(1) Nonconfinement provisions —

**(i)** General rule. Under the rules of paragraphs (b) and (c) of this section, a plan or issuer may not establish a rule for eligibility (as described in paragraph (b)(1)(ii) of this section) or set any individual's premium or contribution rate based on whether an individual is confined to a hospital or other health care institution. In addition, under the rules of paragraphs (b) and (c) of this section, a plan or issuer may not establish a rule for eligibility or set any individual's premium or contribution rate based on an individual's ability to engage in normal life activities, except to the extent permitted under paragraphs (e)(2)(ii) and (3) of this section (permitting plans and issuers, under certain circumstances, to distinguish among employees based on the performance of services).

**(ii)** Examples. The rules of this paragraph (e)(1) are illustrated by the following examples:

Example 1.

**(i)** Facts. Under a group health plan, coverage for employees and their dependents generally becomes effective on the first day of employment. However, coverage for a dependent who is confined to a hospital or other health care institution does not become effective until the confinement ends.

**(ii)** Conclusion. In this Example 1, the plan violates this paragraph (e)(1) because the plan delays the effective date of coverage for dependents based on confinement to a hospital or other health care institution.

Example 2.

**(i)** Facts. In previous years, a group health plan has provided coverage through a group health insurance policy offered by Issuer M. However, for the current year, the plan provides coverage through a group health insurance policy offered by Issuer N. Under Issuer N 's policy, items and services provided in connection with the confinement of a dependent to a hospital or other health care institution are not covered if the confinement is covered under an extension of benefits clause from a previous health insurance issuer.

**(ii)** Conclusion. In this Example 2, Issuer N violates this paragraph (e)(1) because the group health insurance coverage restricts benefits (a rule for eligibility under paragraph (b)(1)) based on whether a dependent is confined to a hospital or other health care institution that is covered under an extension of benefits clause from a previous issuer. State law cannot change the obligation of Issuer N under this section. However, under State law Issuer M may also be responsible for providing benefits to such a dependent. In a case in which Issuer N has an obligation under this section to provide benefits and Issuer M has an obligation under State law to provide benefits, any State laws designed to prevent more than 100% reimbursement, such as State coordination-of-benefits laws, continue to apply.

**(2)** Actively-at-work and continuous service provisions —(i) General rule —

29 CFR 2590.702

**(A)** Under the rules of paragraphs (b) and (c) of this section and subject to the exception for the first day of work described in paragraph (e)(2)(ii) of this section, a plan or issuer may not establish a rule for eligibility (as described in paragraph (b)(1)(ii) of this section) or set any individual's premium or contribution rate based on whether an individual is actively at work (including whether an individual is continuously employed), unless absence from work due to any health factor (such as being absent from work on sick leave) is treated, for purposes of the plan or health insurance coverage, as being actively at work.

**(B)** The rules of this paragraph (e)(2)(i) are illustrated by the following examples: Example 1.

**(i)** Facts. Under a group health plan, an employee generally becomes eligible to enroll 30 days after the first day of employment. However, if the employee is not actively at work on the first day after the end of the 30-day period, then eligibility for enrollment is delayed until the first day the employee is actively at work.

**(ii)** Conclusion. In this Example 1, the plan violates this paragraph (e)(2) (and thus also violates paragraph (b) of this section). However, the plan would not violate paragraph (e)(2) or (b) of this section if, under the plan, an absence due to any health factor is considered being actively at work.

Example 2.

**(i)** Facts. Under a group health plan, coverage for an employee becomes effective after 90 days of continuous service; that is, if an employee is absent from work (for any reason) before completing 90 days of service, the beginning of the 90-day period is measured from the day the employee returns to work (without any credit for service before the absence).

**(ii)** Conclusion. In this Example 2, the plan violates this paragraph (e)(2) (and thus also paragraph (b) of this section) because the 90-day continuous service requirement is a rule for eligibility based on whether an individual is actively at work. However, the plan would not violate this paragraph (e)(2) or paragraph (b) of this section if, under the plan, an absence due to any health factor is not considered an absence for purposes of measuring 90 days of continuous service. (In addition, any eligibility provision that is time-based must comply with the requirements of PHS Act section 2708 and its implementing regulations.)

**(ii)** Exception for the first day of work —

**(A)** Notwithstanding the general rule in paragraph (e)(2)(i) of this section, a plan or issuer may establish a rule for eligibility that requires an individual to begin work for the employer sponsoring the plan (or, in the case of a multiemployer plan, to begin a job in covered employment) before coverage becomes effective, provided that such a rule for eligibility applies regardless of the reason for the absence.

**(B)** The rules of this paragraph (e)(2)(ii) are illustrated by the following examples: Example 1.

**(i)** Facts. Under the eligibility provision of a group health plan, coverage for new employees becomes effective on the first day that the employee reports to work.

Individual H is scheduled to begin work on August 3. However, H is unable to begin work on that day because of illness. H begins working on August 4, and H 's coverage is effective on August 4.

**(ii)** Conclusion. In this Example 1, the plan provision does not violate this section. However, if coverage for individuals who do not report to work on the first day they were scheduled to work for a reason unrelated to a health factor (such as vacation or bereavement) becomes effective on the first day they were scheduled to work, then the plan would violate this section.

Example 2.

**(i)** Facts. Under a group health plan, coverage for new employees becomes effective on the first day of the month following the employee's first day of work, regardless of whether the employee is actively at work on the first day of the month. Individual J is scheduled to begin work on March 24. However, J is unable to begin work on March 24 because of illness. J begins working on April 7 and J 's coverage is effective May 1.

**(ii)** Conclusion. In this Example 2, the plan provision does not violate this section. However, as in Example 1, if coverage for individuals absent from work for reasons unrelated to a health factor became effective despite their absence, then the plan would violate this section.

**(3)** Relationship to plan provisions defining similarly situated individuals —

**(i)** Notwithstanding the rules of paragraphs (e)(1) and (2) of this section, a plan or issuer may establish rules for eligibility or set any individual's premium or contribution rate in accordance with the rules relating to similarly situated individuals in paragraph (d) of this section. Accordingly, a plan or issuer may distinguish in rules for eligibility under the plan between full-time and part-time employees, between permanent and temporary or seasonal employees, between current and former employees, and between employees currently performing services and employees no longer performing services for the employer, subject to paragraph (d) of this section. However, other Federal or State laws (including the COBRA continuation provisions and the Family and Medical Leave Act of 1993) may require an employee or the employee's dependents to be offered coverage and set limits on the premium or contribution rate even though the employee is not performing services.

**(ii)** The rules of this paragraph (e)(3) are illustrated by the following examples:

Example 1.

**(i)** Facts. Under a group health plan, employees are eligible for coverage if they perform services for the employer for 30 or more hours per week or if they are on paid leave (such as vacation, sick, or bereavement leave). Employees on unpaid leave are treated as a separate group of similarly situated individuals in accordance with the rules of paragraph (d) of this section.

**(ii)** Conclusion. In this Example 1, the plan provisions do not violate this section. However, if the plan treated individuals performing services for the employer for 30 or more hours per week, individuals on vacation leave, and individuals on bereavement

leave as a group of similarly situated individuals separate from individuals on sick leave, the plan would violate this paragraph (e) (and thus also would violate paragraph (b) of this section) because groups of similarly situated individuals cannot be established based on a health factor (including the taking of sick leave) under paragraph (d) of this section.

Example 2.

> **(i) Facts.** To be eligible for coverage under a bona fide collectively bargained group health plan in the current calendar quarter, the plan requires an individual to have worked 250 hours in covered employment during the three-month period that ends one month before the beginning of the current calendar quarter. The distinction between employees working at least 250 hours and those working less than 250 hours in the earlier three-month period is not directed at individual participants or beneficiaries based on any health factor of the participants or beneficiaries.

**(ii) Conclusion.** In this Example 2, the plan provision does not violate this section because, under the rules for similarly situated individuals allowing full-time employees to be treated differently than part-time employees, employees who work at least 250 hours in a three-month period can be treated differently than employees who fail to work 250 hours in that period. The result would be the same if the plan permitted individuals to apply excess hours from previous periods to satisfy the requirement for the current quarter.

Example 3.

> **(i) Facts.** Under a group health plan, coverage of an employee is terminated when the individual's employment is terminated, in accordance with the rules of paragraph (d) of this section. Employee B has been covered under the plan. B experiences a disabling illness that prevents B from working. B takes a leave of absence under the Family and Medical Leave Act of 1993. At the end of such leave, B terminates employment and consequently loses coverage under the plan. (This termination of coverage is without regard to whatever rights the employee (or members of the employee's family) may have for COBRA continuation coverage.)

**(ii) Conclusion.** In this Example 3, the plan provision terminating B 's coverage upon B 's termination of employment does not violate this section.

Example 4.

> **(i) Facts.** Under a group health plan, coverage of an employee is terminated when the employee ceases to perform services for the employer sponsoring the plan, in accordance with the rules of paragraph (d) of this section. Employee C is laid off for three months. When the layoff begins, C 's coverage under the plan is terminated. (This termination of coverage is without regard to whatever rights the employee (or members of the employee's family) may have for COBRA continuation coverage.)

**(ii) Conclusion.** In this Example 4, the plan provision terminating C 's coverage upon the cessation of C 's performance of services does not violate this section.

**(f)** Nondiscriminatory wellness programs — in general. A wellness program is a program of health promotion or disease prevention. Paragraphs (b)(2)(ii) and (c)(3) of this section

provide exceptions to the general prohibitions against discrimination based on a health factor for plan provisions that vary benefits (including cost-sharing mechanisms) or the premium or contribution for similarly situated individuals in connection with a wellness program that satisfies the requirements of this paragraph (f).

**(1)** Definitions. The definitions in this paragraph (f)(1) govern in applying the provisions of this paragraph (f).

**(i)** Reward. Except where expressly provided otherwise, references in this section to an individual obtaining a reward include both obtaining a reward (such as a discount or rebate of a premium or contribution, a waiver of all or part of a cost-sharing mechanism, an additional benefit, or any financial or other incentive) and avoiding a penalty (such as the absence of a premium surcharge or other financial or nonfinancial disincentive). References in this section to a plan providing a reward include both providing a reward (such as a discount or rebate of a premium or contribution, a waiver of all or part of a cost-sharing mechanism, an additional benefit, or any financial or other incentive) and imposing a penalty (such as a surcharge or other financial or nonfinancial disincentive).

**(ii)** Participatory wellness programs. If none of the conditions for obtaining a reward under a wellness program is based on an individual satisfying a standard that is related to a health factor (or if a wellness program does not provide a reward), the wellness program is a participatory wellness program. Examples of participatory wellness programs are:

**(A)** A program that reimburses employees for all or part of the cost for membership in a fitness center.

**(B)** A diagnostic testing program that provides a reward for participation in that program and does not base any part of the reward on outcomes.

**(C)** A program that encourages preventive care through the waiver of the copayment or deductible requirement under a group health plan for the costs of, for example, prenatal care or well-baby visits. (Note that, with respect to non-grandfathered plans, § 2590.715-2713 of this part requires benefits for certain preventive health services without the imposition of cost sharing.)

**(D)** A program that reimburses employees for the costs of participating, or that otherwise provides a reward for participating, in a smoking cessation program without regard to whether the employee quits smoking.

**(E)** A program that provides a reward to employees for attending a monthly, no-cost health education seminar.

**(F)** A program that provides a reward to employees who complete a health risk assessment regarding current health status, without any further action (educational or otherwise) required by the employee with regard to the health issues identified as part of the assessment. (See also § 2590.702-1 for rules prohibiting collection of genetic information.)

**(iii)** Health-contingent wellness programs. A health-contingent wellness program is a program that requires an individual to satisfy a standard related to a health factor

29 CFR 2590.702

to obtain a reward (or requires an individual to undertake more than a similarly situated individual based on a health factor in order to obtain the same reward). A health-contingent wellness program may be an activity-only wellness program or an outcome-based wellness program.

**(iv)** Activity-only wellness programs. An activity-only wellness program is a type of health-contingent wellness program that requires an individual to perform or complete an activity related to a health factor in order to obtain a reward but does not require the individual to attain or maintain a specific health outcome. Examples include walking, diet, or exercise programs, which some individuals may be unable to participate in or complete (or have difficulty participating in or completing) due to a health factor, such as severe asthma, pregnancy, or a recent surgery. See paragraph (f)(3) of this section for requirements applicable to activity-only wellness programs.

**(v)** Outcome-based wellness programs. An outcome-based wellness program is a type of health-contingent wellness program that requires an individual to attain or maintain a specific health outcome (such as not smoking or attaining certain results on biometric screenings) in order to obtain a reward. To comply with the rules of this paragraph (f), an outcome-based wellness program typically has two tiers. That is, for individuals who do not attain or maintain the specific health outcome, compliance with an educational program or an activity may be offered as an alternative to achieve the same reward. This alternative pathway, however, does not mean that the overall program, which has an outcome-based component, is not an outcome-based wellness program. That is, if a measurement, test, or screening is used as part of an initial standard and individuals who meet the standard are granted the reward, the program is considered an outcome-based wellness program. For example, if a wellness program tests individuals for specified medical conditions or risk factors (including biometric screening such as testing for high cholesterol, high blood pressure, abnormal body mass index, or high glucose level) and provides a reward to individuals identified as within a normal or healthy range for these medical conditions or risk factors, while requiring individuals who are identified as outside the normal or healthy range (or at risk) to take additional steps (such as meeting with a health coach, taking a health or fitness course, adhering to a health improvement action plan, complying with a walking or exercise program, or complying with a health care provider's plan of care) to obtain the same reward, the program is an outcome-based wellness program. See paragraph (f)(4) of this section for requirements applicable to outcome-based wellness programs.

**(2)** Requirement for participatory wellness programs. A participatory wellness program, as described in paragraph (f)(1)(ii) of this section, does not violate the provisions of this section only if participation in the program is made available to all similarly situated individuals, regardless of health status.

**(3)** Requirements for activity-only wellness programs. A health-contingent wellness program that is an activity-only wellness program, as described in paragraph (f)(1)(iv)

of this section, does not violate the provisions of this section only if all of the following requirements are satisfied:

**(i)** Frequency of opportunity to qualify. The program must give individuals eligible for the program the opportunity to qualify for the reward under the program at least once per year.

**(ii)** Size of reward. The reward for the activity-only wellness program, together with the reward for other health-contingent wellness programs with respect to the plan, must not exceed the applicable percentage (as defined in paragraph (f)(5) of this section) of the total cost of employee-only coverage under the plan. However, if, in addition to employees, any class of dependents (such as spouses, or spouses and dependent children) may participate in the wellness program, the reward must not exceed the applicable percentage of the total cost of the coverage in which an employee and any dependents are enrolled. For purposes of this paragraph (f)(3)(ii), the cost of coverage is determined based on the total amount of employer and employee contributions towards the cost of coverage for the benefit package under which the employee is (or the employee and any dependents are) receiving coverage.

**(iii)** Reasonable design. The program must be reasonably designed to promote health or prevent disease. A program satisfies this standard if it has a reasonable chance of improving the health of, or preventing disease in, participating individuals, and it is not overly burdensome, is not a subterfuge for discriminating based on a health factor, and is not highly suspect in the method chosen to promote health or prevent disease. This determination is based on all the relevant facts and circumstances.

**(iv)** Uniform availability and reasonable alternative standards. The full reward under the activity-only wellness program must be available to all similarly situated individuals.

**(A)** Under this paragraph (f)(3)(iv), a reward under an activity-only wellness program is not available to all similarly situated individuals for a period unless the program meets both of the following requirements:

**(1)** The program allows a reasonable alternative standard (or waiver of the otherwise applicable standard) for obtaining the reward for any individual for whom, for that period, it is unreasonably difficult due to a medical condition to satisfy the otherwise applicable standard; and

**(2)** The program allows a reasonable alternative standard (or waiver of the otherwise applicable standard) for obtaining the reward for any individual for whom, for that period, it is medically inadvisable to attempt to satisfy the otherwise applicable standard.

**(B)** While plans and issuers are not required to determine a particular reasonable alternative standard in advance of an individual's request for one, if an individual is described in either paragraph (f)(3)(iv)(A)(1) or (2) of this section, a reasonable

alternative standard must be furnished by the plan or issuer upon the individual's request or the condition for obtaining the reward must be waived.

**(C)** All the facts and circumstances are taken into account in determining whether a plan or issuer has furnished a reasonable alternative standard, including but not limited to the following:

**(1)** If the reasonable alternative standard is completion of an educational program, the plan or issuer must make the educational program available or assist the employee in finding such a program (instead of requiring an individual to find such a program unassisted), and may not require an individual to pay for the cost of the program.

**(2)** The time commitment required must be reasonable (for example, requiring attendance nightly at a one-hour class would be unreasonable).

**(3)** If the reasonable alternative standard is a diet program, the plan or issuer is not required to pay for the cost of food but must pay any membership or participation fee.

**(4)** If an individual's personal physician states that a plan standard (including, if applicable, the recommendations of the plan's medical professional) is not medically appropriate for that individual, the plan or issuer must provide a reasonable alternative standard that accommodates the recommendations of the individual's personal physician with regard to medical appropriateness. Plans and issuers may impose standard cost sharing under the plan or coverage for medical items and services furnished pursuant to the physician's recommendations.

**(D)** To the extent that a reasonable alternative standard under an activity-only wellness program is, itself, an activity-only wellness program, it must comply with the requirements of this paragraph (f)(3) in the same manner as if it were an initial program standard. (Thus, for example, if a plan or issuer provides a walking program as a reasonable alternative standard to a running program, individuals for whom it is unreasonably difficult due to a medical condition to complete the walking program (or for whom it is medically inadvisable to attempt to complete the walking program) must be provided a reasonable alternative standard to the walking program.) To the extent that a reasonable alternative standard under an activity-only wellness program is, itself, an outcome-based wellness program, it must comply with the requirements of paragraph (f)(4) of this section, including paragraph (f)(4)(iv)(D).

**(E)** If reasonable under the circumstances, a plan or issuer may seek verification, such as a statement from an individual's personal physician, that a health factor makes it unreasonably difficult for the individual to satisfy, or medically inadvisable for the individual to attempt to satisfy, the otherwise applicable standard of an activity-only wellness program. Plans and issuers may seek verification with respect to requests for a reasonable alternative standard for which it is reasonable to determine that medical judgment is required to evaluate the validity of the request.

**(v)** *Notice of availability of reasonable alternative standard.* The plan or issuer must disclose in all plan materials describing the terms of an activity-only wellness

program the availability of a reasonable alternative standard to qualify for the reward (and, if applicable, the possibility of waiver of the otherwise applicable standard), including contact information for obtaining a reasonable alternative standard and a statement that recommendations of an individual's personal physician will be accommodated. If plan materials merely mention that such a program is available, without describing its terms, this disclosure is not required. Sample language is provided in paragraph (f)(6) of this section, as well as in certain examples of this section.

**(vi)** Example. The provisions of this paragraph (f)(3) are illustrated by the following example:

Example.

**(i)** Facts. A group health plan provides a reward to individuals who participate in a reasonable specified walking program. If it is unreasonably difficult due to a medical condition for an individual to participate (or if it is medically inadvisable for an individual to attempt to participate), the plan will waive the walking program requirement and provide the reward. All materials describing the terms of the walking program disclose the availability of the waiver.

**(ii)** Conclusion. In this Example, the program satisfies the requirements of paragraph (f)(3)(iii) of this section because the walking program is reasonably designed to promote health and prevent disease. The program satisfies the requirements of paragraph (f)(3)(iv) of this section because the reward under the program is available to all similarly situated individuals. It accommodates individuals for whom it is unreasonably difficult to participate in the walking program due to a medical condition (or for whom it would be medically inadvisable to attempt to participate) by providing them with the reward even if they do not participate in the walking program (that is, by waiving the condition). The plan also complies with the disclosure requirement of paragraph (f)(3)(v) of this section. Thus, the plan satisfies paragraphs (f)(3)(iii), (iv), and (v) of this section.

**(4)** Requirements for outcome-based wellness programs. A health-contingent wellness program that is an outcome-based wellness program, as described in paragraph (f)(1)(v) of this section, does not violate the provisions of this section only if all of the following requirements are satisfied:

**(i)** Frequency of opportunity to qualify. The program must give individuals eligible for the program the opportunity to qualify for the reward under the program at least once per year.

**(ii)** Size of reward. The reward for the outcome-based wellness program, together with the reward for other health-contingent wellness programs with respect to the plan, must not exceed the applicable percentage (as defined in paragraph (f)(5) of this section) of the total cost of employee-only coverage under the plan. However, if, in addition to employees, any class of dependents (such as spouses, or spouses and dependent children) may participate in the wellness program, the reward must not exceed the applicable percentage of the total cost of the coverage in which an employee and any dependents are enrolled. For purposes of this

paragraph (f)(4)(ii), the cost of coverage is determined based on the total amount of employer and employee contributions towards the cost of coverage for the benefit package under which the employee is (or the employee and any dependents are) receiving coverage.

**(iii)** Reasonable design. The program must be reasonably designed to promote health or prevent disease. A program satisfies this standard if it has a reasonable chance of improving the health of, or preventing disease in, participating individuals, and it is not overly burdensome, is not a subterfuge for discriminating based on a health factor, and is not highly suspect in the method chosen to promote health or prevent disease. This determination is based on all the relevant facts and circumstances. To ensure that an outcome-based wellness program is reasonably designed to improve health and does not act as a subterfuge for underwriting or reducing benefits based on a health factor, a reasonable alternative standard to qualify for the reward must be provided to any individual who does not meet the initial standard based on a measurement, test, or screening that is related to a health factor, as explained in paragraph (f)(4)(iv) of this section.

**(iv)** Uniform availability and reasonable alternative standards. The full reward under the outcome-based wellness program must be available to all similarly situated individuals.

**(A)** Under this paragraph (f)(4)(iv), a reward under an outcome-based wellness program is not available to all similarly situated individuals for a period unless the program allows a reasonable alternative standard (or waiver of the otherwise applicable standard) for obtaining the reward for any individual who does not meet the initial standard based on the measurement, test, or screening, as described in this paragraph (f)(4)(iv).

**(B)** While plans and issuers are not required to determine a particular reasonable alternative standard in advance of an individual's request for one, if an individual is described in paragraph (f)(4)(iv)(A) of this section, a reasonable alternative standard must be furnished by the plan or issuer upon the individual's request or the condition for obtaining the reward must be waived.

**(C)** All the facts and circumstances are taken into account in determining whether a plan or issuer has furnished a reasonable alternative standard, including but not limited to the following:

**(1)** If the reasonable alternative standard is completion of an educational program, the plan or issuer must make the educational program available or assist the employee in finding such a program (instead of requiring an individual to find such a program unassisted), and may not require an individual to pay for the cost of the program.

**(2)** The time commitment required must be reasonable (for example, requiring attendance nightly at a one-hour class would be unreasonable).

**(3)** If the reasonable alternative standard is a diet program, the plan or issuer is not required to pay for the cost of food but must pay any membership or participation fee.

**(4)** If an individual's personal physician states that a plan standard (including, if applicable, the recommendations of the plan's medical professional) is not medically appropriate for that individual, the plan or issuer must provide a reasonable alternative standard that accommodates the recommendations of the individual's personal physician with regard to medical appropriateness. Plans and issuers may impose standard cost sharing under the plan or coverage for medical items and services furnished pursuant to the physician's recommendations.

**(D)** To the extent that a reasonable alternative standard under an outcome-based wellness program is, itself, an activity-only wellness program, it must comply with the requirements of paragraph (f)(3) of this section in the same manner as if it were an initial program standard. To the extent that a reasonable alternative standard under an outcome-based wellness program is, itself, another outcome-based wellness program, it must comply with the requirements of this paragraph (f)(4), subject to the following special provisions:

**(1)** The reasonable alternative standard cannot be a requirement to meet a different level of the same standard without additional time to comply that takes into account the individual's circumstances. For example, if the initial standard is to achieve a BMI less than 30, the reasonable alternative standard cannot be to achieve a BMI less than 31 on that same date. However, if the initial standard is to achieve a BMI less than 30, a reasonable alternative standard for the individual could be to reduce the individual's BMI by a small amount or small percentage, over a realistic period of time, such as within a year.

**(2)** An individual must be given the opportunity to comply with the recommendations of the individual's personal physician as a second reasonable alternative standard to meeting the reasonable alternative standard defined by the plan or issuer, but only if the physician joins in the request. The individual can make a request to involve a personal physician's recommendations at any time and the personal physician can adjust the physician's recommendations at any time, consistent with medical appropriateness.

**(E)** It is not reasonable to seek verification, such as a statement from an individual's personal physician, under an outcome-based wellness program that a health factor makes it unreasonably difficult for the individual to satisfy, or medically inadvisable for the individual to attempt to satisfy, the otherwise applicable standard as a condition of providing a reasonable alternative to the initial standard. However, if a plan or issuer provides an alternative standard to the otherwise applicable measurement, test, or screening that involves an activity that is related to a health factor, then the rules of paragraph (f)(3) of this section for activity-only wellness programs apply to that component of the wellness program and the plan or issuer may, if reasonable under the circumstances, seek verification that it is unreasonably difficult due to a medical condition for an individual to perform or complete the activity (or it is medically inadvisable to attempt to perform or complete the activity). (For example, if an outcome-based wellness program requires participants to maintain a certain healthy weight and provides a diet and exercise program for individuals who do not meet the targeted

weight, a plan or issuer may seek verification, as described in paragraph (f)(3)(iv)(D) of this section, if reasonable under the circumstances, that a second reasonable alternative standard is needed for certain individuals because, for those individuals, it would be unreasonably difficult due to a medical condition to comply, or medically inadvisable to attempt to comply, with the diet and exercise program, due to a medical condition.)

**(v)** Notice of availability of reasonable alternative standard. The plan or issuer must disclose in all plan materials describing the terms of an outcome-based wellness program, and in any disclosure that an individual did not satisfy an initial outcome-based standard, the availability of a reasonable alternative standard to qualify for the reward (and, if applicable, the possibility of waiver of the otherwise applicable standard), including contact information for obtaining a reasonable alternative standard and a statement that recommendations of an individual's personal physician will be accommodated. If plan materials merely mention that such a program is available, without describing its terms, this disclosure is not required. Sample language is provided in paragraph (f)(6) of this section, as well as in certain examples of this section.

**(vi)** Examples. The provisions of this paragraph (f)(4) are illustrated by the following examples:

Example 1 — Cholesterol screening with reasonable alternative standard to work with personal physician.

**(i)** Facts. A group health plan offers a reward to participants who achieve a count under 200 on a total cholesterol test. If a participant does not achieve the targeted cholesterol count, the plan allows the participant to develop an alternative cholesterol action plan in conjunction with the participant's personal physician that may include recommendations for medication and additional screening. The plan allows the physician to modify the standards, as medically necessary, over the year. (For example, if a participant develops asthma or depression, requires surgery and convalescence, or some other medical condition or consideration makes completion of the original action plan inadvisable or unreasonably difficult, the physician may modify the original action plan.) All plan materials describing the terms of the program include the following statement: "Your health plan wants to help you take charge of your health. Rewards are available to all employees who participate in our Cholesterol Awareness Wellness Program. If your total cholesterol count is under 200, you will receive the reward. If not, you will still have an opportunity to qualify for the reward. We will work with you and your doctor to find a Health Smart program that is right for you." In addition, when any individual participant receives notification that his or her cholesterol count is 200 or higher, the notification includes the following statement: "Your plan offers a Health Smart program under which we will work with you and your doctor to try to lower your cholesterol. If you complete this program, you will qualify for a reward. Please contact us at contact information to get started."

**(ii)** Conclusion. In this Example 1, the program is an outcome-based wellness program because the initial standard requires an individual to attain or maintain a specific health outcome (a certain cholesterol level) to obtain a reward. The program satisfies the requirements of paragraph (f)(4)(iii) of this section because the

cholesterol program is reasonably designed to promote health and prevent disease. The program satisfies the requirements of paragraph (f)(4)(iv) of this section because it makes available to all participants who do not meet the cholesterol standard a reasonable alternative standard to qualify for the reward. Lastly, the plan also discloses in all materials describing the terms of the program and in any disclosure that an individual did not satisfy the initial outcome-based standard the availability of a reasonable alternative standard (including contact information and the individual's ability to involve his or her personal physician), as required by paragraph (f)(4)(v) of this section. Thus, the program satisfies the requirements of paragraphs (f)(4)(iii), (iv), and (v) of this section.

Example 2 — Cholesterol screening with plan alternative and no opportunity for personal physician involvement.

**(i) Facts.** Same facts as Example 1, except that the wellness program's physician or nurse practitioner (rather than the individual's personal physician) determines the alternative cholesterol action plan. The plan does not provide an opportunity for a participant's personal physician to modify the action plan if it is not medically appropriate for that individual.

> **(ii) Conclusion.** In this Example 2, the wellness program does not satisfy the requirements of paragraph (f)(4)(iii) of this section because the program does not accommodate the recommendations of the participant's personal physician with regard to medical appropriateness, as required under paragraph (f)(4)(iv)(C)(3) of this section. Thus, the program is not reasonably designed under paragraph (f)(4)(iii) of this section and is not available to all similarly situated individuals under paragraph (f)(4)(iv) of this section. The notice also does not provide all the content required under paragraph (f)(4)(v) of this section.

> Example 3 — Cholesterol screening with plan alternative that can be modified by personal physician.

**(i) Facts.** Same facts as Example 2, except that if a participant's personal physician disagrees with any part of the action plan, the personal physician may modify the action plan at any time, and the plan discloses this to participants.

> **(ii) Conclusion.** In this Example 3, the wellness program satisfies the requirements of paragraph (f)(4)(iii) of this section because the participant's personal physician may modify the action plan determined by the wellness program's physician or nurse practitioner at any time if the physician states that the recommendations are not medically appropriate, as required under paragraph (f)(4)(iv)(C)(3) of this section. Thus, the program is reasonably designed under paragraph (f)(4)(iii) of this section and is available to all similarly situated individuals under paragraph (f)(4)(iv) of this section. The notice, which includes a statement that recommendations of an individual's personal physician will be accommodated, also complies with paragraph (f)(4)(v) of this section.

> Example 4 — BMI screening with walking program alternative.

**(i) Facts.** A group health plan will provide a reward to participants who have a body mass index (BMI) that is 26 or lower, determined shortly before the beginning of the year. Any participant who does not meet the target BMI is given the same discount if the participant

complies with an exercise program that consists of walking 150 minutes a week. Any participant for whom it is unreasonably difficult due to a medical condition to comply with this walking program (and any participant for whom it is medically inadvisable to attempt to comply with the walking program) during the year is given the same discount if the participant satisfies an alternative standard that is reasonable taking into consideration the participant's medical situation, is not unreasonably burdensome or impractical to comply with, and is otherwise reasonably designed based on all the relevant facts and circumstances. All plan materials describing the terms of the wellness program include the following statement: "Fitness is Easy! Start Walking! Your health plan cares about your health. If you are considered overweight because you have a BMI of over 26, our Start Walking program will help you lose weight and feel better. We will help you enroll. (**If your doctor says that walking isn't right for you, that's okay too. We will work with you (and, if you wish, your own doctor) to develop a wellness program that is.)" Participant E is unable to achieve a BMI that is 26 or lower within the plan's timeframe and receives notification that complies with paragraph (f)(4)(v) of this section. Nevertheless, it is unreasonably difficult due to a medical condition for E to comply with the walking program. E proposes a program based on the recommendations of E's physician. The plan agrees to make the same discount available to E that is available to other participants in the BMI program or the alternative walking program, but only if E actually follows the physician's recommendations.

**(ii)** Conclusion. In this Example 4, the program is an outcome-based wellness program because the initial standard requires an individual to attain or maintain a specific health outcome (a certain BMI level) to obtain a reward. The program satisfies the requirements of paragraph (f)(4)(iii) of this section because it is reasonably designed to promote health and prevent disease. The program also satisfies the requirements of paragraph (f)(4)(iv) of this section because it makes available to all individuals who do not satisfy the BMI standard a reasonable alternative standard to qualify for the reward (in this case, a walking program that is not unreasonably burdensome or impractical for individuals to comply with and that is otherwise reasonably designed based on all the relevant facts and circumstances). In addition, the walking program is, itself, an activity-only standard and the plan complies with the requirements of paragraph (f)(3) of this section (including the requirement of paragraph (f)(3)(iv) that, if there are individuals for whom it is unreasonably difficult due to a medical condition to comply, or for whom it is medically inadvisable to attempt to comply, with the walking program, the plan provide a reasonable alternative to those individuals). Moreover, the plan satisfies the requirements of paragraph (f)(4)(v) of this section because it discloses, in all materials describing the terms of the program and in any disclosure that an individual did not satisfy the initial outcome-based standard, the availability of a reasonable alternative standard (including contact information and the individual's option to involve his or her personal physician) to qualify for the reward or the possibility of waiver of the otherwise applicable standard. Thus, the program satisfies the requirements of paragraphs (f)(4)(iii), (iv), and (v) of this section.

Example 5— BMI screening with alternatives available to either lower BMI or meet personal physician's recommendations.

29 CFR 2590.702

**(i)** Facts. Same facts as Example 4 except that, with respect to any participant who does not meet the target BMI, instead of a walking program, the participant is expected to reduce BMI by one point. At any point during the year upon request, any individual can obtain a second reasonable alternative standard, which is compliance with the recommendations of the participant's personal physician regarding weight, diet, and exercise as set forth in a treatment plan that the physician recommends or to which the physician agrees. The participant's personal physician is permitted to change or adjust the treatment plan at any time and the option of following the participant's personal physician's recommendations is clearly disclosed.

> **(ii)** Conclusion. In this Example 5, the reasonable alternative standard to qualify for the reward (the alternative BMI standard requiring a one-point reduction) does not make the program unreasonable under paragraph (f)(4)(iii) or (iv) of this section because the program complies with paragraph (f)(4)(iv)(C)(4) of this section by allowing a second reasonable alternative standard to qualify for the reward (compliance with the recommendations of the participant's personal physician, which can be changed or adjusted at any time). Accordingly, the program continues to satisfy the applicable requirements of paragraph (f) of this section.
>
> Example 6— Tobacco use surcharge with smoking cessation program alternative.

**(i)** Facts. In conjunction with an annual open enrollment period, a group health plan provides a premium differential based on tobacco use, determined using a health risk assessment. The following statement is included in all plan materials describing the tobacco premium differential: "Stop smoking today! We can help! If you are a smoker, we offer a smoking cessation program. If you complete the program, you can avoid this surcharge." The plan accommodates participants who smoke by facilitating their enrollment in a smoking cessation program that requires participation at a time and place that are not unreasonably burdensome or impractical for participants, and that is otherwise reasonably designed based on all the relevant facts and circumstances, and discloses contact information and the individual's option to involve his or her personal physician. The plan pays for the cost of participation in the smoking cessation program. Any participant can avoid the surcharge for the plan year by participating in the program, regardless of whether the participant stops smoking, but the plan can require a participant who wants to avoid the surcharge in a subsequent year to complete the smoking cessation program again.

> **(ii)** Conclusion. In this Example 6, the premium differential satisfies the requirements of paragraphs (f)(4)(iii), (iv), and (v). The program is an outcome-based wellness program because the initial standard for obtaining a reward is dependent on the results of a health risk assessment (a measurement, test, or screening). The program is reasonably designed under paragraph (f)(4)(iii) because the plan provides a reasonable alternative standard (as required under paragraph (f)(4)(iv) of this section) to qualify for the reward to all tobacco users (a smoking cessation program). The plan discloses, in all materials describing the terms of the program, the availability of the reasonable alternative standard (including contact information and the individual's option to involve his or her personal physician). Thus, the program satisfies the requirements of paragraphs (f)(4)(iii), (iv), and (v) of this section.

Example 7— Tobacco use surcharge with alternative program requiring actual cessation.

**(i)** Facts. Same facts as Example 6, except the plan does not provide participant F with the reward in subsequent years unless F actually stops smoking after participating in the tobacco cessation program.

**(ii)** Conclusion. In this Example 7, the program is not reasonably designed under paragraph (f)(4)(iii) of this section and does not provide a reasonable alternative standard as required under paragraph (f)(4)(iv) of this section. The plan cannot cease to provide a reasonable alternative standard merely because the participant did not stop smoking after participating in a smoking cessation program. The plan must continue to offer a reasonable alternative standard whether it is the same or different (such as a new recommendation from F' s personal physician or a new nicotine replacement therapy).

Example 8— Tobacco use surcharge with smoking cessation program alternative that is not reasonable.

**(i)** Facts. Same facts as Example 6, except the plan does not facilitate participant F' s enrollment in a smoking cessation program. Instead the plan advises F to find a program, pay for it, and provide a certificate of completion to the plan.

**(ii)** Conclusion. In this Example 8, the requirement for F to find and pay for F' s own smoking cessation program means that the alternative program is not reasonable. Accordingly, the plan has not offered a reasonable alternative standard that complies with paragraphs (f)(4)(iii) and (iv) of this section and the program fails to satisfy the requirements of paragraph (f) of this section.

**(5)** Applicable percentage —

**(i)** For purposes of this paragraph (f), the applicable percentage is 30 percent, except that the applicable percentage is increased by an additional 20 percentage points (to 50 percent) to the extent that the additional percentage is in connection with a program designed to prevent or reduce tobacco use.

**(ii)** The rules of this paragraph (f)(5) are illustrated by the following examples:

Example 1.

**(i)** Facts. An employer sponsors a group health plan. The annual premium for employee-only coverage is $ 6,000 (of which the employer pays $ 4,500 per year and the employee pays $ 1,500 per year). The plan offers employees a health-contingent wellness program with several components, focused on exercise, blood sugar, weight, cholesterol, and blood pressure. The reward for compliance is an annual premium rebate of $ 600.

**(ii)** Conclusion. In this Example 1, the reward for the wellness program, $ 600, does not exceed the applicable percentage of 30 percent of the total annual cost of employee-only coverage, $ 1,800. ($ 6,000 x 30% = $ 1,800.)

Example 2.

**(i)** Facts. Same facts as Example 1, except the wellness program is exclusively a tobacco prevention program. Employees who have used tobacco in the last 12 months and who are

not enrolled in the plan's tobacco cessation program are charged a $ 1,000 premium surcharge (in addition to their employee contribution towards the coverage). (Those who participate in the plan's tobacco cessation program are not assessed the $ 1,000 surcharge.)

**(ii)** Conclusion. In this Example 2, the reward for the wellness program (absence of a $ 1,000 surcharge), does not exceed the applicable percentage of 50 percent of the total annual cost of employee-only coverage, $ 3,000. ($ 6,000 x 50% = $ 3,000.)

Example 3.

**(i)** Facts. Same facts as Example 1, except that, in addition to the $ 600 reward for compliance with the health-contingent wellness program, the plan also imposes an additional $ 2,000 tobacco premium surcharge on employees who have used tobacco in the last 12 months and who are not enrolled in the plan's tobacco cessation program. (Those who participate in the plan's tobacco cessation program are not assessed the $ 2,000 surcharge.)

**(ii)** Conclusion. In this Example 3, the total of all rewards (including absence of a surcharge for participating in the tobacco program) is $ 2,600 ($ 600 + $ 2,000 = $ 2,600), which does not exceed the applicable percentage of 50 percent of the total annual cost of employee-only coverage ($ 3,000); and, tested separately, the $ 600 reward for the wellness program unrelated to tobacco use does not exceed the applicable percentage of 30 percent of the total annual cost of employee-only coverage ($ 1,800).

Example 4.

**(i)** Facts. An employer sponsors a group health plan. The total annual premium for employee-only coverage (including both employer and employee contributions towards the coverage) is $ 5,000. The plan provides a $ 250 reward to employees who complete a health risk assessment, without regard to the health issues identified as part of the assessment. The plan also offers a Healthy Heart program, which is a health-contingent wellness program, with an opportunity to earn a $ 1,500 reward.

**(ii)** Conclusion. In this Example 4, even though the total reward for all wellness programs under the plan is $ 1,750 ($ 250 + $ 1,500 = $ 1,750, which exceeds the applicable percentage of 30 percent of the cost of the annual premium for employee-only coverage ($ 5,000 x 30% = $ 1,500)), only the reward offered for compliance with the health-contingent wellness program ($ 1,500) is taken into account in determining whether the rules of this paragraph (f)(5) are met. (The $ 250 reward is offered in connection with a participatory wellness program and therefore is not taken into account.) Accordingly, the health-contingent wellness program offers a reward that does not exceed the applicable percentage of 30 percent of the total annual cost of employee-only coverage.

**(6)** Sample language. The following language, or substantially similar language, can be used to satisfy the notice requirement of paragraphs (f)(3)(v) or (f)(4)(v) of this section: "Your health plan is committed to helping you achieve your best health. Rewards for participating in a wellness program are available to all employees. If you think you might be unable to meet a standard for a reward under this wellness program, you might qualify for an opportunity to earn the same reward by different means. Contact us at insert contact information and we will work with you (and, if you

29 CFR 2590.702

wish, with your doctor) to find a wellness program with the same reward that is right for you in light of your health status."

**(g)** More favorable treatment of individuals with adverse health factors permitted —(1) In rules for eligibility —

> **(i)** Nothing in this section prevents a group health plan or group health insurance issuer from establishing more favorable rules for eligibility (described in paragraph (b)(1) of this section) for individuals with an adverse health factor, such as disability, than for individuals without the adverse health factor. Moreover, nothing in this section prevents a plan or issuer from charging a higher premium or contribution with respect to individuals with an adverse health factor if they would not be eligible for the coverage were it not for the adverse health factor. (However, other laws, including State insurance laws, may set or limit premium rates; these laws are not affected by this section.)

> **(ii)** The rules of this paragraph (g)(1) are illustrated by the following examples: Example 1.

**(i)** Facts. An employer sponsors a group health plan that generally is available to employees, spouses of employees, and dependent children until age 26. However, dependent children who are disabled are eligible for coverage beyond age 26.

> **(ii)** Conclusion. In this Example 1, the plan provision allowing coverage for disabled dependent children beyond age 26 satisfies this paragraph (g)(1) (and thus does not violate this section).
> Example 2.

**(i)** Facts. An employer sponsors a group health plan, which is generally available to employees (and members of the employee's family) until the last day of the month in which the employee ceases to perform services for the employer. The plan generally charges employees $ 50 per month for employee-only coverage and $ 125 per month for family coverage. However, an employee who ceases to perform services for the employer by reason of disability may remain covered under the plan until the last day of the month that is 12 months after the month in which the employee ceased to perform services for the employer. During this extended period of coverage, the plan charges the employee $ 100 per month for employee-only coverage and $ 250 per month for family coverage. (This extended period of coverage is without regard to whatever rights the employee (or members of the employee's family) may have for COBRA continuation coverage.)

> **(ii)** Conclusion. In this Example 2, the plan provision allowing extended coverage for disabled employees and their families satisfies this paragraph (g)(1) (and thus does not violate this section). In addition, the plan is permitted, under this paragraph (g)(1), to charge the disabled employees a higher premium during the extended period of coverage.
> Example 3.

**(i)** Facts. To comply with the requirements of a COBRA continuation provision, a group health plan generally makes COBRA continuation coverage available for a maximum period of 18 months in connection with a termination of employment but makes the coverage

available for a maximum period of 29 months to certain disabled individuals and certain members of the disabled individual's family. Although the plan generally requires payment of 102 percent of the applicable premium for the first 18 months of COBRA continuation coverage, the plan requires payment of 150 percent of the applicable premium for the disabled individual's COBRA continuation coverage during the disability extension if the disabled individual would not be entitled to COBRA continuation coverage but for the disability.

**(ii)** Conclusion. In this Example 3, the plan provision allowing extended COBRA continuation coverage for disabled individuals satisfies this paragraph (g)(1) (and thus does not violate this section). In addition, the plan is permitted, under this paragraph (g)(1), to charge the disabled individuals a higher premium for the extended coverage if the individuals would not be eligible for COBRA continuation coverage were it not for the disability. (Similarly, if the plan provided an extended period of coverage for disabled individuals pursuant to State law or plan provision rather than pursuant to a COBRA continuation coverage provision, the plan could likewise charge the disabled individuals a higher premium for the extended coverage.)

**(2)** In premiums or contributions —

**(i)** Nothing in this section prevents a group health plan or group health insurance issuer from charging individuals a premium or contribution that is less than the premium (or contribution) for similarly situated individuals if the lower charge is based on an adverse health factor, such as disability.

**(ii)** The rules of this paragraph (g)(2) are illustrated by the following example: Example.

**(i)** Facts. Under a group health plan, employees are generally required to pay $ 50 per month for employee-only coverage and $ 125 per month for family coverage under the plan. However, employees who are disabled receive coverage (whether employee-only or family coverage) under the plan free of charge.

**(ii)** Conclusion. In this Example, the plan provision waiving premium payment for disabled employees is permitted under this paragraph (g)(2) (and thus does not violate this section).

**(h)** No effect on other laws. Compliance with this section is not determinative of compliance with any other provision of the Act (including the COBRA continuation provisions) or any other State or Federal law, such as the Americans with Disabilities Act. Therefore, although the rules of this section would not prohibit a plan or issuer from treating one group of similarly situated individuals differently from another (such as providing different benefit packages to current and former employees), other Federal or State laws may require that two separate groups of similarly situated individuals be treated the same for certain purposes (such as making the same benefit package available to COBRA qualified beneficiaries as is made available to active employees). In addition, although this section generally does not impose new disclosure obligations on plans and issuers, this section does not affect any other laws, including those that require accurate disclosures and prohibit intentional misrepresentation.

**(i)** Applicability dates. This section applies for plan years beginning on or after July 1, 2007.

## Statutory Authority

*Authority Note Applicable to 29 CFR Subtit. B, Ch. XXV, Subch. L, Pt. 2590*

## History

[*62 FR 16894*, 16952, Apr. 8, 1997, as corrected at *62 FR 31669*, June 10, 1997; *66 FR 1378*, 1404, Jan. 8, 2001; *66 FR 14076*, 14077, Mar. 9, 2001; *71 FR 75014*, 75038, Dec. 13, 2006; *74 FR 51664*, 51683, Oct. 7, 2009; *78 FR 33158*, 33181, June 3, 2013; *79 FR 10296*, 10309, Feb. 24, 2014]

Annotations

## Notes

**[EFFECTIVE DATE NOTE:**

*78 FR 33158* , 33181, June 3, 2013, revised paragraph (f), effective Aug. 2, 2013; *79 FR 10296* , 10309, Feb. 24, 2014, amended this section, effective Apr. 25, 2014.]

**Notes to Decisions**

   **Healthcare Law: Insurance: Coverage: Employee Retirement Income Security Act (ERISA)**

   **Pensions & Benefits Law: Employee Retirement Income Security Act (ERISA): Health Insurance Portability & Accountability Act**

**Healthcare Law: Insurance: Coverage: Employee Retirement Income Security Act (ERISA)**

*Zurich Am. Ins. Co. v. O'Hara, 604 F.3d 1232, 22 Fla. L. Weekly Fed. C 731, 49 Employee Benefits Cas. (BNA) 1018, 2010 U.S. App. LEXIS 8570 (11th Cir. 2010)*, reh'g, en banc, denied, *408 Fed. Appx. 344, 2010 U.S. App. LEXIS 27352 (11th Cir. 2010)*, cert. denied, *562 U.S. 1139, 131 S. Ct. 943, 178 L. Ed. 2d 755, 50 Employee Benefits Cas. (BNA) 3015, 2011 U.S. LEXIS 56 (2011)*.

*Zurich Am. Ins. Co. v. O'Hara, 604 F.3d 1232, 22 Fla. L. Weekly Fed. C 731, 49 Employee Benefits Cas. (BNA) 1018, 2010 U.S. App. LEXIS 8570 (11th Cir. 2010)*, reh'g, en banc, denied, *408 Fed. Appx. 344, 2010 U.S. App. LEXIS 27352 (11th Cir. 2010)*, cert. denied, *562 U.S. 1139, 131 S. Ct. 943, 178 L. Ed. 2d 755, 50 Employee Benefits Cas. (BNA) 3015, 2011 U.S. LEXIS 56 (2011)*.

***Overview:*** *Summary judgment was properly granted for ERISA fiduciary on claim for reimbursement of medical expenses paid on behalf of plan participant under plan's*

*reimbursement and subrogation provision because full reimbursement of expenses recovered by plan participant from third party was both appropriate and equitable under 29 U.S.C.S. § 1132(a)(3).*

- • *29 C.F.R. § 2590.702(b)(2)(i)(B) (2010)*states that benefits provided under a plan must be uniformly available to all similarly situated individuals. *Go To Headnote*

**Pensions & Benefits Law: Employee Retirement Income Security Act (ERISA): Health Insurance Portability & Accountability Act**

*Ames v. Group Health Inc., 553 F. Supp. 2d 187, 43 Employee Benefits Cas. (BNA) 2906, 2008 U.S. Dist. LEXIS 27656 (E.D.N.Y. 2008).*

*Ames v. Group Health Inc., 553 F. Supp. 2d 187, 43 Employee Benefits Cas. (BNA) 2906, 2008 U.S. Dist. LEXIS 27656 (E.D.N.Y. 2008).*

***Overview:*** *The insurer was correct to argue that under the plain terms of the insurer's proposal and rider, the participant was not a covered employee on April 1, 2002. When the insurer agreed to provide coverage for the fund, the insurer did not assume coverage of employees like the participant who did not work twenty hours or more weekly.*

- • Pursuant to *29 U.S.C.S. § 1182(a)*, a group health plan, and a health insurance issuer offering group health insurance coverage in connection with a group health plan, may not establish rules for eligibility (including continued eligibility) of any individual to enroll under the terms of the plan based on health status and, or disability. *29 U.S.C.S. § 1182*. The regulations provide that a plan or issuer may distinguish in rules for eligibility under the plan between full-time and part-time employees. *29 C.F.R. § 2590.702(e)(3)*. The regulations establish that any restriction on a benefit or benefits must apply uniformly to all similarly situated individuals and must not be directed at individual participants or beneficiaries based on any health factor of the participants or beneficiaries (determined based on all the relevant facts and circumstances). *29 C.F.R. § 2590.702(b)(2)(i)(B)*. *Go To Headnote*

- • The regulations provide: a plan or issuer may not establish a rule for eligibility (as described in paragraph (b)(1)(ii) of this section) or set any individual's premium or contribution rate based on whether an individual is actively at work (including whether an individual is continuously employed), unless absence from work due to any health factor (such as being absent from work on sick leave) is treated, for purposes of the plan or health insurance coverage, as being actively at work. *29 C.F.R. § 2590.702(e)(2) (2005)*. *Go To Headnote*

## Research References & Practice Aids

**Hierarchy Notes:**

29 CFR 2590.702

*29 CFR Subtit. B, Ch. XXV*

*29 CFR Subtit. B, Ch. XXV, Subch. L, Pt. 2590*

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2023 All rights reserved.

**End of Document**

EXHIBIT F



**Results for:** C.D. Cal. Civ. R. 7-3

**Statutes and Legislation**

1. [L.R. 7-3. Conference of Counsel Prior to Filing of Motions. n2](#)

CA - California Local, State & Federal Court Rules | C.D. Cal. Loc. R. 7-3

LOCAL RULES OF THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA > CHAPTER I. LOCAL CIVIL RULES, INTEGRATED WITH TITLES OF FEDERAL RULES OF CIVIL PROCEDURE n1 > III. PLEADINGS AND MOTIONS > III. F.R.Civ.P. 7. PLEADINGS ALLOWED; FORM OF MOTIONS AND OTHER PAPERS > L.R. 7-3. Conference of Counsel Prior to Filing of Motions. n2

In all cases not listed as exempt in L.R. 16-12, and except in connection with discovery motions (which are governed by L.R. 37-1 through 37-4) and applications under F.R.Civ.P. 65 for temporary restraining orders or preliminary injunctions, counsel contemplating the filing of any motion must first contact opposing counsel to discuss thoroughly, preferably in person, the substance of the contemplated motion and any potential resolution. The conference must take place at least 7 days prior to the filing of the motion. If the parties are unable to reach a resolution that eliminates the necessity for a hearing, counsel ...